THE UNITED STATES, APPELLANTS, *vs.* ELIZABETH WIGGINS, APPELLEE.

A grant of land by Estrada, the Governor of East Florida, was made on the 1st of August, 1815, to Elizabeth Wiggins, on her petition, stating, that "owing to the diminution of trade, she will have to devote herself to the pursuits of the country." The grant was made for the quantity of land apportioned by the regulations of East Florida, to the number of the family of the grantee. It was regularly surveyed by the surveyor general, according to the petition and grant. No settlement or improvement was ever made by the grantee, or by any one acting for her on the property. In 1831, Elizabeth Wiggins presented a petition to the Superior Court of East Florida, praying for a confirmation of the grant; and in July, 1838, the Court gave a decree in favour of the claimant. On an appeal to the Supreme Court of the United States, the decree of the Superior Court of East Florida was reversed. The Court held, that by the regulations established on the 25th November, 1818, by Governor Coppinger, the grant had become void, because of the non-improvement, and the neglect to settle the land granted.

The existence of a foreign law, especially when unwritten, is a fact to be proved like any other fact, by appropriate evidence.

A copy of a decree by the governor of East Florida, granting land to a petitioner while Spain had possession of the territory, certified by the secretary of the government to have been faithfully made from the original in the secretary's office, is evidence in the Courts of the United States. By the laws of Spain, prevailing in the province at that time, the secretary was the proper officer to give copies; and the law trusted him for this particular purpose, so far as he acted under its authority. The original was confined to the public office.

The cases of Owings *vs.* Hull, 9 Peters, 624. Percheman's case, 7 Peters, 51. The United States *vs.* Delespine, 12 Peters, 655, cited.

Prima facie evidence of a fact, is such, as in judgment of law is sufficient to establish the fact, and if not rebutted, remains sufficient evidence of it. Kelly *vs.* Jackson, 6 Peters, 632, cited.

The eighth article of the Florida treaty stipulates that, "grants of land made by Spain in Florida, after the 24th of January, 1818, shall be ratified and confirmed to the persons in possession of the land, to the same extent that the same grants would be valid if the government of the territory had remained under the dominion of Spain." The government of the United States may take advantage of the non-performance of the conditions prescribed by the law relative to grants of land, if the treaty does not provide for the omission.

In the cases of Arredondo, 6 Peters, 691, and Percheman, 7 Peters, 51, it was held, that the words in the Florida treaty "shall be ratified and confirmed;" in reference to perfect titles, should be construed, "are" ratified and confirmed. The object of the Court in these cases was to exempt them from the operation of the eighth article, for that they were perfect titles by the laws of Spain when the treaty was made; and that when the soil and sovereignty of Florida were ceded by the second article, private rights of property were, by implication, protected. By the law of nations, the rights to property are secured when territories are ceded; and to reconcile the eighth article of the treaty with the law of nations, the Spanish side of the article was referred to in aid of the American side. The Court held, that perfect titles, "stood confirmed" by the treaty; and must be so recognised by the United States, in our Courts.

Perfect titles to lands, made by Spain in the territory of Florida before the 24th January, 1818, are intrinsically valid, and exempt from the provision of the eighth article of the treaty; and they need no sanction from the legislative or judicial departments of the United States.

The eighth article of the Florida treaty was intended to apply to claims to land whose validity depended on the performance of conditions, in consideration of which the concessions had been made; and which must have been performed before Spain was bound to perfect the titles. The United States were bound after the cession of the country, to the same extent that Spain had been bound before the ratification of the treaty, to perfect them by legislation and adjudication.

APPEAL from the Superior Court of East Florida.

The appellee, Elizabeth Wiggins, on the 1st of August, 1815, presented a petition to Estrada, the governor of East Florida, stating that, "owing to the diminution of trade, she will have to devote herself to the pursuits of the country;" and wishing to establish herself on the eastern side of the pond of St. George, "she asked the governor to grant three hundred acres in the said place, as she had five children, and five slaves, with herself."

By a decree of the 6th of August, 1815, the object of the petition was granted by Governor Estrada, and "a certified copy of this instance and decree," was ordered to be issued to the petitioner, "from the secretary's office." A certified copy of these documents was given to the petitioner, on the same day, by "Don Tomas De Aguilar."

A survey of the land was made by the surveyor general of the province, on the 23d of March, 1821. On the 26th of May, 1831, Elizabeth Wiggins presented a petition to the judge of the Superior Court of East Florida, stating her claim to three hundred acres of land, granted to her by Governor Estrada, and praying that the validity of the claim might be inquired into, and decided by the Court, in pursuance of the acts of Congress.

The answer of the District Attorney of the United States to this petition, denied the right of Elizabeth Wiggins to the land claimed on many grounds. Those which were brought into examination, and decided upon, were:

First, That the petitioner had never taken possession of or cultivated the land.

Second, The petitioner was required to make proof that a grant for the land had been issued.

Third, That the petitioner having failed and neglected to occupy, improve, or cultivate the land, and having abandoned it, the right and title thereto, if any had existed, were wholly forfeited and lost.

Subsequently, a replication to the answer of the United States was filed, and the original certified copy of the grant to Elizabeth Wiggins of the land, the same being certified by Tomas De Aguilar, secretary, &c., was offered in evidence by the claimant, and was objected to by the United States.

The Court admitted the evidence.

By an amended bill, the petitioner also stated, that no condition of settlement or improvement was contained in the grant of the land; and that if any condition of settlement had been contained in it, the unprotected situation of that part of East Florida from Indian depredations and aggressions, from the time of the grant to the cession of the territory of Florida to the United States, had rendered it impossible to settle in that portion of the country with safety to the persons or property of those who might venture so to do.

The United States in an amended answer, set up in further opposition to the claim of the petitioner, the usage, practice, and custom,

of the government of Spain, which prevailed when the alleged grant was made; that ten years' occupancy and cultivation of the land, under such a grant, was necessary to give the grantee the title in fee simple to the land. The United States stated other objections to the title claimed by the petitioner; and denied that the settlement of the land was rendered dangerous by the disturbed state of the country.

The parties to the cause proceeded to take evidence in support and in opposition to the claim of the petitioner; and the cause was heard on the documents and evidence. At July term, 1838, the Superior Court made a decree confirming the title of Elizabeth Wiggins to the land claimed by her. From this decree the United States took an appeal to this Court.

The case was argued by Mr. Gilpin, Attorney General, and Mr. Dent, for the United States; and by Mr. Downing, for the appellee.

Mr. Gilpin, for the United States.

This is one of a numerous class of cases which has of late years repeatedly claimed the consideration of this Court. The rule laid down by the late Chief Justice is one that should be recognised whenever they are discussed: that "it would violate the usage of nations, and outrage the sense of justice, to annul private rights." To protect these is the duty of this Court; and it was also unquestionably the desire and object of the executive government, when it made the treaty with Spain. The eighth article of that treaty was adopted after much discussion and change; and these discussions turned mainly on the provisions which were to guard private and existing interests. But, on the other hand, fraud is to be prevented; the public domain, of which the acquisition was costly, is to be protected; opportunities of deception growing out of the change of dominion are to be watched; titles are to be saved from embarrassment and conflict; and the regulations made imperative on the landholder, by the Spanish laws, are not to be wantonly relaxed. The Spanish land law in Florida was one of great liberality; occupation and cultivation formed the only price which the government required from its grantees; but this price it did absolutely require. While, therefore, we sacredly uphold every vested right, and reserve to every citizen of Florida the privileges he derived under the Spanish law, we must exact of him proof of a compliance with the conditions that law imposed, before we allow him the benefit of its privileges. We have no right to tolerate what would facilitate or sanction fraud or unjustifiable negligence.

The Spanish government would not, in its most liberal spirit, have confirmed to the present claimant the grant of land she now seeks to obtain. Her claim is founded on a concession of three hundred acres, alleged to have been given by Governor Estrada, in 1815, and to have been surveyed in 1821; but never, as is admitted, possessed or cultivated to this day. Two inquiries, therefore, present

themselves: first, whether such a concession was ever made in point of fact; and secondly, whether, if it was not, the acts of the claimant since have been such as now to authorize its confirmation.

1. That no such concession was ever granted by Governor Estrada may be inferred from the fact that none was ever produced or exhibited until the year 1833, eighteen years after it purports to have been made. The claim itself first appears in the report of the register and receiver, dated in January, 1827, twelve years after the alleged grant. Even then it is sustained only by an alleged certificate of survey, dated on the 23d March, 1821, purporting to have been made by the surveyor general, Clarke, six years after the grant, in face of the Spanish law, which required the possession to be taken within six months after the date of the grant. There was no evidence of occupation or cultivation; none of the existence of the concession now relied on; its existence was not even alleged till the year 1833; the claim up to that time was admitted to rest on the certificate of survey by Clarke, which, if genuine, was made by him in direct violation of the Spanish land law.

But, independent of the strong inferences resulting from these circumstances, the documentary title now set up is inadmissible as legal evidence. No original paper is exhibited; of the concession we have merely a copy certified by Aguilar, the governor's secretary; of the certificate of survey we have merely a copy certified by the keeper of the public archives. No evidence is offered to show that either of these papers ever existed. Aguilar, the person who copied the concession, is not produced; Clarke, the surveyor general, who is examined, does not prove either the concession or his own certificate of the survey; Alvarez, a clerk in Aguilar's office at the time, never saw or heard of the original concession; Cavedo, a clerk in ~~e~~ record office, knows nothing of it; no evidence of its existence, and consequently of its loss or destruction, appears throughout the record.

To supply the want of this, the claimant attempts to establish a presumption of loss, by alleging that the documents in the record office were so carelessly kept as to make the loss of these papers very probable. But this allegation is quite inconsistent with the testimony before this Court. The papers are shown, at all events, to have been carefully kept from 1815 to 1821; yet Alvarez, who kept them, and constantly examined them, never saw such a concession; in 1821, the return of the survey must have led him to recur to it, if in existence: the surveyor general, who was well acquainted with the office papers, never saw it: in a list of documents made soon after the change of flags, neither the concession nor certificate of survey is alluded to. These circumstances, taken in connexion with the fact that the concession was never relied on by the claimant till 1833, are inconsistent with the presumption of existence and loss. Nor is this all; there is evidence which goes far to raise a contrary presumption: the loss of no grant from these archives has been alleged, except such as now depend on copies certified by

Aguilar; and evidence was offered to prove, that, in two cases at least, he had proposed to forge, or did actually forge, documents of a similar charac'er; although this evidence, being objected to by the claimant, was no doubt properly rejected, yet it forms a strong circumstance, taken in connexion with the rest, to authorize a presumption that there never was any original concession.

Admitting, however, the facts on which the claimant presumes this loss, yet they can have no weight, as legal evidence, without previous proof that the document in question did actually exist. Satisfactory testimony that the original existed, is absolutely necessary before the certified copy can be admitted. In the case of Goodier vs. Lake, 1 Atkyns, 446, Lord Hardwicke required, not merely that the existence but the genuineness of a note, alleged to be lost, should be shown before a copy was admitted; and in that of Irwin vs. Simpson, 7 Bro. Parl. Cases, 317, an office copy of a bill was rejected, though an officer of the Court was ready to prove that the original could not be found, after a search among the records. In the case of Cauffman vs. The Congregation of Cedar Springs, 6 Binney, 63, the Supreme Court of Pennsylvania held, that, in order to prove the substance of a written agreement, evidence of its existence must be first given, and then that it was lost or destroyed. So in the case of Meyer vs. Barker, 6 Binney, 237, the same Court say, that before secondary evidence of the contents of a written instrument can be given, "there must be proof that such instrument once existed, and is lost or destroyed." This rule has been repeatedly recognised by other judicial tribunals; Jackson vs. Todd, 3 Johns. Rep. 304; Spencer vs. Spencer, 1 Gallison, 624: and, in this Court, distinct proof that a lost deed had been in possession of a person to whom it properly belonged, was regarded as a necessary ground for the admission of secondary evidence of its contents. Minor vs. Tillotson, 7 Peters, 101. The present claimant offers no direct testimony whatever of the existence of her concession. The only evidence in fact is, that a copy of it is referred to in the certificate of survey; but even of that certificate of survey nothing but a copy is produced. Clearly, the case is not brought within the well established rule.

It is contended, however, that the rule in question does not apply where the originals are placed in a public office, and the office is allowed by law to give to the parties certified copies. To this it is answered, in the first place, that this exception does not in any case dispense with direct proof of the original having existed; but, in the second place, it is never applicable in a case where the genuineness of the original is contested. In the case of the United States vs. Percheman, 7 Peters, 84, where the question arose in regard to the admission of these certificates, it was declared by the Court, in admitting them, that the original must be produced, if either party should suggest the necessity of so doing. In the case of Minor vs. Tillotson, 7 Peters, 101, it was held, that wherever suspicion hung over the instrument, the copy was not to be admitted without rigid

inquiry.   In the case of the United States vs, Jones, 8 Peters, 382, it·was held, that although a certified treasury transcript of documents. filed in the public offices, is made, by law, of equal validity· with the originals, yet the defendant is at liberty to impeach the evidence thus certified, and, on allegation of fraud, require the production·of the original. . In the case of Owings vs. Hull, 9 Peters, 626, where the copy of a bill of sale in Louisiana was admitted, it was done upon the express ground that the original was in the possession of the ·notary.   In the case of Winn vs. Patterson, 9 Peters, 675, it . was held, that there must be satisfactory proof of the genuineness and due execution of a power of attorney, before a copy from the public office of the recorder could be received.   In the case of the United States vs. Delespine, 12 Peters, 656, the extent to which these certificates of Florida concessions were to be admitted, as evidence, was discussed; and their admission was made to depend upon the fact that there was positive proof of the existence of the original concession, in the office of the secretary who gave the certificate. This case, therefore, is not excepted from the common law·rule, making proof of the existence of the original necessary, by the fact that its deposit in a public office was required.

It is however contended, that by the usages recognised in the Spanish law, the certificate is.evidence without proving the existence of the. original.   No authority has been cited .on this point; no law, order, receipt, or judicial decision to that effect, has been exhibited.   The claimant relies on the parol evidence of a few persons in Florida, to prove what, if it exists, must be a well settled rule in the judicial tribunals of Spain.   This is not a matter of mere local usage, which is to be established like an ordinary fact.   But taking the parol testimony in the record, it will be found, that in ·every instance where the witnesses speak of a certified copy of a concession being of equal validity with the original, they explain themselves as referring to cases where the original is known or proved to .exist.   Alvarez, the principal witness of the claimant on this point, says, that " he does not recollect a certified copy of a grant being received in evidence in a Spanish Court of justice, where the original was not on file in the proper office; and from his knowledge of the practice of the government, he.does not believe that such a copy would be received in evidence in a Spanish Court, unless the party could prove that the original was in the office at the time the copy was made."

On these grounds, it is submitted that there is no evidence of this. concession ever having been made; but a strong presumption against it.

2. If, however, the original concession is proved, still the claimant is not entitled to a confirmation of it, because she performed none of the conditions which were required to perfect her title by the Spanish law.

Grants of land in Florida, by the Spanish authorities, so far as

they have come before this Court, appear to have been of three classes.

First. Absolute grants, in consideration of services already performed, which were made by the governors, in special cases, either by virtue of a special power recognised by the laws of the Indies, (2 White's New Recopilacion, 38. 40. 52 ;) or by the authority given, in particular decrees, coming directly or indirectly from the sovereign, as in the case of the grants conferred upon Salus, Paulin, and Percheman, in reward for their services. 2 White's New Rec. 280. The very nature of these grants forbids a limitation on the quantity, or on the consideration that might move them. They are recognised by this Court in the cases of the United States *vs.* Percheman, 7 Peters, 97; and United States *vs.* Clarke, 8 Peters, 453.

Second. Grants in consideration of services to be performed, and deemed specially important for the improvement of the province. These do not seem to have grown out of any law or royal order, but were not infrequent for some years before the cession of Florida. They were established by usage, and recognised as lawful. 2 White's New Recopilacion, 386. 289, 290. The services appear to have been of three kinds : the erection of saw mills, factories, or mechanical works; the introduction and rearing of large numbers of cattle; and the establishment in particular places of large bodies of settlers. The titles to these were, in some instances, absolute on their face, and conveyed a present grant from their date, though coupled with conditions for the subsequent performance of the specified services; or they were mere concessions or incipient grants, securing a future absolute title, on the performance of the conditions. The first are recognised by this Court, in the cases of United States *vs.* Arredondo, 6 Peters, 745, 746. United States *vs.* Clarke, 8 Peters, 441. 467. United States *vs.* Sibbald, 10 Peters, 313; and others. The second, in the cases of United States *vs.* Mills, 12 Peters, 215, and United States *vs.* Kingsley, 12 Peters, 477. 486.

Third. But the great class of cases was that of gratuitous grants, in moderate quantities, for purposes of actual occupation and cultivation. To this class is applicable the general system of Spanish land law which existed in Florida and Louisiana; and the regulations embraced under it are as clear and distinct as those of the land laws of the United States. It is true, the grants were gratuitous, but the performance of the conditions annexed by that law, was a consideration as explicit as the payment required by our laws.

The regulations in regard to these grants are first found in the compilation of the laws of the Indies, promulgated by the Spanish sovereign in 1682. By those laws, grants were distributed by the governors to settlers, on condition that they should take actual possession of the lands granted in three months, and build upon and cultivate them; and after four years of such occupation, they were entitled to hold the land in absolute property. 2 White's New Rec 48. 50, 51. The incipient grant, termed a concession, was deposited

in the office of the governor's secretary; but, on proof of the necessary occupation and cultivation, the settler received an absolute grant, or, as it was called, a royal title, which was recorded in the office of the escribano, or notary of the province. 2 White's New Rec. 283. The quantity to be given to each settler is not prescribed in the laws of the Indies, but the governors are directed to graduate it. These regulations are subsequently recognised by the King of Spain, in his royal orders of 1735, 1754, and 1768, (2 White's New Rec. 62. 64. 71;) and in the latter it is declared, that " where any shall not apply themselves in a proper manner to improve the lands allotted to them, the same shall be taken from them, (which I do without mercy,) and granted to others who shall fulfil the conditions." In 1770, O'Reilley, the Governor of Louisiana, promulgated his regulations, fixing two hundred and forty arpens as the quantity of a concession for a family, and allowing an absolute title, in the name of the king, after three years' cultivation and improvement, to be ascertained after strict inquiry. 2 White's New Rec. 229, 230. In 1790, under the administration of Governor Quesada, in East Florida, and pursuant to a royal order, dated the 29th November, 1789, we have the quantity allotted to the settlers in that province specifically designated; one hundred acres are assigned to each head of a family, and fifty to each other person composing it, whether white or black; provision is also made, that foreign emigrants shall first take an oath of allegiance to Spain; the surveyor general is required to inform the settlers that they will obtain their concessions or incipient titles from the governor's secretary; and also, to give them express notice that the conditions prescribed by law must be completed, before they can receive an absolute title. 2 White's New Rec. 276. 1 Clarke's Land Laws, 996—998. In 1797, Governor Gayoso, in Louisiana, enlarged the allotment to two hundred acres for the head of the family, fifty acres for each child, and twenty for each negro; he required possession to be taken within one year, and gave an absolute title after three years' cultivation. 2 White's New Rec. 233. In 1799, Governor Morales declared, explicitly, that notwithstanding the concession, or first grant, by which the settler obtained possession, he was " not to be regarded as the owner of the land until his royal title was delivered complete." 2 White's New Rec. 239. In 1803, Governor White, in East Florida, reduced the allotment to fifty acres for the head of the family, twenty-five acres to each child and slave above the age of sixteen years, and fifteen acres to each that was younger; he declared that " every concession, in which no time was specified, should be null, if possession and cultivation were not commenced within six months." He also required ten years' possession before an absolute or royal title was granted; and decreed, that if, in any case, the land was abandoned for two years, the title should be absolutely void. 2 White's New Rec. 259. 277. 278. 281. In 1811, Governor Estrada solicited permission to change these regulations, and to be allowed to sell the lands absolutely for money, in lieu of granting them gra-

2 F 2

tuitously on conditions of cultivation and settlement; but all change in the system was explicitly refused. 2 White's New Rec. 266, 267. In 1813, the Cortes, under the new Spanish constitution, passed an ordinance authorizing such sales, but this was repealed the next year, and the previous laws and regulations were restored. Clarke's Land Laws, 1007. 1010. 8 Peters, 455. With this partial exception, (which does not appear to have been acted on in practice,) the regulations of Governor White continued in full force till 1815, when Governor Kindelan, on account of the Indian disturbance, relaxed them so far as to grant absolute titles to settlers who had actually built houses and improved their lands, though the ten years' settlement was not complete. 2 White's New Rec. 288. In 1818, Governor Coppinger, at the instance of Garrido, an agent of the Duke of Alagon, directed a full investigation and review of the land system of Florida to be made; and the report of Saavedra, which was sanctioned by the governor, fully establishes the regula·tions which have been cited, as then in existence; whether they relate to the absolute grants, the grants upon express condition, or the gratuitous concessions for purposes of settlement and cultivation. 2 White's New Rec. 282. 288.

The claimant's title in this case rests on a concession of Governor Estrada of three hundred acres; not asked or granted for any services, but because "she has five children and five slaves, with herself." This entitled her to three hundred acres. At that time the regulations of Governor White were in full force. She never occupied the land or cultivated it, at any time from the date of the concession to the present day. It cannot be doubted but that under the Spanish law, "her concession is of no value or effect, the prescribed conditions not having been complied with, nor can she by means of it claim any right to the land granted, which should now be considered vacant." These are the words of Saavedra. 2 White's New Rec. 283.

But it is said the eighth article of the treaty between Spain and the United States, ceding Florida, recognises this as a valid and existing title, because there is no condition expressed in it. The treaty declares, that "Spanish grants, made before the 24th January, 1818, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid, if the territories had remained under the dominion of Spain." 6 Laws of the United States, 618. 2 White's New Rec. 210. The meaning of this article has been fully canvassed and settled by this Court. In the case of the United States vs. Arredondo, (6 Peters, 741,) it was held, that under the treaty, and without the necessity of any further act by the United States, all complete and absolute titles then existing, "stood confirmed;" and this decision was repeated in the case of the United States vs. Percheman, 7 Peters, 89. But all grants which were not complete and absolute, could only be made valid by the legislation of the United States. The question, then, resolves itself into this: has any legislation, in pursuance of this

treaty, given validity to a concession or imperfect title, where the grantee had not performed the conditions required by the Spanish law, to make the grant valid?  The first act, that of 8th May, 1822, (3 Story's Laws, 1870,) directs an examination by commissioners into the fact, whether the claim presented was valid, "agreeably to the laws and ordinances previously existing of the governments making the grant."  The act of 3d March, 1823, (3 Story's Laws, 1907,) recognises and directs the same inquiry.  The act of 28th February, 1824, (3 Story's Laws, 1935,) makes it incumbent on the claimant to establish, that "the conditions required by the laws and ordinances of the Spanish government," shall have been complied with.  And the act of 23d May, 1828, (4 Story's Laws, 2124,) which finally submits the claims to a judicial decision, restricts them by the rule prescribed in the act of the 26th May, 1824, (3 Story's Laws, 1959,) to such as "might have been perfected into a complete title under and in conformity to the laws, usages, and customs of the government, under which the same originated."  While, therefore, a complete and perfect grant is recognised as valid, without inquiring into the fact, how far it had been duly made; it is apparent that neither by the treaty, nor by the legislation of Congress, is an inceptive or imperfect grant confirmed, unless it might have been perfected under the laws and usages of Spain.  It has been shown that the present claim could not have been so perfected, but that it was, and is, absolutely null; and "the land granted should now be considered as vacant."

Nor can any decision of this Court be shown which goes to establish such a claim; no case exactly similar has come before it; but so far as the principles heretofore laid down, are applicable to it, it is submitted that they sustain the ground now taken, on behalf of the United States.  If so, the decision of the Court below was erroneous, and the claim of the appellee should be rejected; even if it be admitted that the proof of the existence of the original concession is sufficient.

Mr. Downing, for the appellee, contended,

1. That this copy is full and sufficient proof of the grant: First, by the Spanish laws and usages; and, second, by the common law of England, adopted in Florida, as primary evidence before the Spanish Court—as secondary and sufficient before ours.

2. That the absence of the original from the archives, is accounted for by the carelessness with which the papers were kept; and does not furnish a presumption that it never existed.

The appellee may safely rest her case on the authority of the cases decided by this Court, as to the proof of the grant from Governor Estrada.  A certified copy of the grant is presented, and this is the only paper a claimant of land in East Florida can have.  The petition for the grant, and the order of the Governor of Florida upon it, are office papers; and always on file in the office of the secretary

of the government. Certified copies, which serve as titles, are issued by the government. This was the practice in all such cases.

The question before the Court is upon the validity of the certifi cate of title.

As to the performance of the condition of settlement, it has been repeatedly held, by this Court, it is a condition subsequent, and does not affect the validity of the grant. 10 Peters, 321. But in the grant to Elizabeth Wiggins, there is no condition of settlement.

It has always been contended in Florida, that even if there is a condition of settlement in the grant, the forfeiture is to be enforced by the government: and until this is done, the grant is in full ope- ration. No case is known in which the forfeiture has been claimed. Grants of this description were made as inducements to settlements and improvements. The government required an agricultural popu- lation, to increase the safety of the whole community from Indian depredations. Grants of land were freely given, when offers of set- tlement were made; but no rigid exaction of penalties followed the failure of the grantee to execute the purposes of improvement and settlement.

This Court, in the case of Percheman, have decided upon the legality of the certified copy of the petition and grant, as evidence. In other cases, the same decision has been made. 12 Peters, 655.

Cited also, in support of the general principles on which the title of the appellee rested, 6 Peters, 727—731. 738. 2 Peters' Digest, 313. Sibbald's case, 10 Peters, 322. 6 Peters, 735.

It is considered as having been settled by the decrees of this Court, in the Florida cases, that all other conditions, but those in Mill grants, are conditions subsequent.

Mr. Justice CATRON delivered the opinion of the Court.

The first question arises upon the admission in evidence of the memorial of Mrs. Wiggins, and the decree thereon by the governor, Estrada, on the certificate of the secretary, Aguilar. They are as follow:

#### MEMORIAL FOR GRANT.

### *Translation.*

" His Excellency the Governor:

" Isabel Wiggins, an inhabitant of the town of Fernandina, with the greatest respect appears before your Excellency, and states, that she has never importuned the attention of the government with peti- tions for lands, as she procured to support her family with the fruits of her industry, in this town; but owing to the diminution of trade, she considers that she will have to devote herself to the pursuits of the country; and wishing to establish herself on the eastern side of the pond of St. George, she supplicates your Excellency to be pleased to grant to her three hundred acres in the said place, as she has five

children and five slaves, with herself; which favour she begs of the just administration of your Excellency.

"*Fernandina, 1st August,* 1815.

"ISABEL WIGGINS."

#### DECREE.

"*St. Augustine, 6th August, one thousand eight hundred and fifteen.*

"The tract which the interested party solicits is granted to her, without prejudice to a third party; and for the security thereof, let a certified copy of this instance and decree be issued to her, from the secretary's office.                                    ESTRADA."

#### CERTIFICATE OF AGUILAR.

"I, Don Tomas de Aguilar, sub-lieutenant of the army, and secretary of the government of the place and province of East Florida, for his majesty, do certify that the preceding copy is faithfully drawn from the original which exists in the secretary's office, under my charge, and pursuant to the order I give the present, in St. Augustine of Florida, on the sixth of August, one thousand eight hundred and fifteen.                                    TOMAS DE AGUILAR."

Before the memorial and concession were offered in evidence, Elizabeth Wiggins made affidavit: "That, in August, 1815, she petitioned for the grant; that she received shortly after from the secretary of the government, a certified copy of the petition and decree; that she never had had possession or control of the original; that she always understood that it was, at the date thereof, placed in the proper public office, as was usual in such cases; that she understood from her counsel the same could not be found; and that she is ignorant what has become of the same."

The affidavit was objected to, on the part of the United States, and rejected by the Court, and the evidence offered received without its aid; on proof being made of the handwriting of Aguilar, the government secretary.

Much evidence was introduced to prove the practice and rules in use in the offices of the Spanish government, from which titles to lands issued. We think the evidence was admissible; the existence of a foreign law, especially when unwritten, is a fact to be proved, like any other fact, by appropriate evidence. The Spanish province of Florida, was foreign to this country in 1815, when the transaction referred to purports to have taken place.

A principal witness to prove the practice in the government Secretary's office, was Alvarez, who had been a clerk in it from 1807, to the time of the change of government, in 1821. He, and others, establish beyond controversy, that persons wishing grants of land from the Spanish government, presented a memorial to the governor, and he decreed on the memorial, in the form pursued in Mrs. Wiggins' case; that the decree of the governor was filed in the secretary's office, and constantly retained there, unless, in cases where a royal title was ordered to be issued, when the decree was trans-

ferred to the escribano's office.   Mrs. Wiggins' is a case of the first class; and the petition and decree could not be removed from the government secretary's office.   These papers were not recorded in books there, but kept in files or bundles. .

The evidence given to the grantee, was a certified copy of the decree, or of the memorial and decree, by the government secretary; and that it was one of the ordinary duties of the secretary to make certified copies of memorials and decrees for the use of the parties. Generally, the decree of the governor directed the copy to be made for the use of the party; and that copies made by the government secretary, and certified by him, were generally received as evidence of title in the Spanish Courts of justice; the copies were made immediately after making the decree, and delivered to the party when he called for them.   No seal was affixed to the secretary's certificate; which was evidence of the facts to which it certified, in a case like this.   From the evidences of the duties incumbent on the government secretary of Florida, derived from this record, and other sources, we have no doubt the duties were such as proved; that the secretary was the proper officer appointed by law to give copies; and that the law trusted him, for this particular purpose, so far as he acted under its authority.   It follows, in this case, as in all others where the originals are confined to a public office, and copies are introduced, that the copy is (first) competent evidence by authority of the certificate of the proper officer: and (second) that it proves, prima facie, the original to have been of file in the office, when the copy was made.   And for this plain reason: the officer's certificate has accorded to it the sanctity of a deposition: he certifies, "that the preceding copy is faithfully drawn from the original, which exits in the secretary's office, under my charge."

The same doctrine was holden in this Court in Owings *vs.* Hull, 9 Peters, 624, 625.   The copy of a bill of sale for slaves, made and of record in a notary's office, in New Orleans, was offered in evidence, without accounting for the original; and objected to for this reason.   By the laws of Louisiana, the original could not be removed from the notary's office; and he was authorized to give a copy.   This was received and deemed evidence of what was contained in the original; and, of course, that it existed when the copy was made.

Again, in Percheman's case, (7 Peters, 85,) it was decided by this Court, that a copy of a Spanish grant, certified by the government secretary, could be given in evidence without accounting for the nonproduction of the original; and this, on general principles; which did not require the aid of legislation: much reliance in that case having been placed upon acts of Congress to give effect to the certificate.

This Court, in the United States *vs,* Delespine, (12 Peters, 655,) recognised the principle, that a certified copy, such as the one before us, was evidence, for there a copy of the first copy was introduced: and when speaking of the first copy, the Court say, "the

first copy was made from the original filed in the proper office, from which the original could not be removed for any purpose. That copy, it is admitted, would have been evidence in the cause." The original copy having been lost, and no decree being found in the government secretary's office in favour of Delespine, although there was proof that one had existed, the copy of the first copy was received, and a decree founded on it.

Delespine's case is, however, prominently distinguished from the present on the main point in controversy ; in that case, there was positive proof of the existence in the secretary's office of the original concession; here there is none, save the inference that arises from Aguilar's certificate, with some other circumstances: and the question is, can a decree for the land be founded upon these proofs; in the face of the fact, that no decree, or evidence of the claim now exists, or has ever been known to exist in the proper office.

We have established that the copy of the petition and decree are made prima facie evidence by the certificate of the secretary. "What is prima facie evidence of a fact ? It is such as, in judgment of law, is sufficient to establish the fact ; and, if not rebutted, remains sufficent for the purpose." Kelly *vs.* Jackson, 6 Peters, 632. And is it rebutted in this case ? Had the papers in the government secretary's office been carefully kept; and had this claim been first brought forward at a late day, as it is insisted in argument it was, (that is, eighteen years after its date,) then the presumption would stand against its original existence ; and it ought to be rejected, if the certificate had no support. But this is far from being the fact. The survey was made by the proper surveyor, for Mrs. Wiggins, March 23d, 1821, in conformity to the memorial and decree, and which refers to their date. Then again she pursued this claim before the register and receiver of the land-office of East Florida, whilst they acted as a board of commissioners for the examination of Spanish claims and titles ; and they rejected it because there was no evidence of cultivation. Truly, the certificate and plot of the survey were only before them; but as no exception appears to have been taken, for want of sufficient evidence of the existence of the concession, the circumstance of the nonproduction of it before the board, has not so much in it as was supposed in the argument.

The record shows why such vigorous exertions were made, either to reject or to destroy the force of Aguilar's certificate. The attorney for the government offered to prove by William G. Davis, that Aguilar, just before the delivery of the province was made to the United States, offered to forge a grant, in favour of the witness, for a tract of land ; and the attorney also offered to prove by William Levington, that about the same time, Aguilar offered to forge, or did actually forge, under the signature of the former governor, White, of that province, a grant of land in favour of the witness; which evidence the Court rejected; and, we think, correctly. Aguilar was not introduced as a witness; but the proof offered sought to establish upon him forgery and fraud in other instances, so as to

destroy the credit of his certificate in this. The secretary may have been honest and faithful in the discharge of his duties in 1815, and grossly the reverse in 1821; and although any number of frauds should be established upon him, still, if the particular act sought to be avoided be not shown to be tainted with fraud, it cannot be affected with other frauds. 4 Peters, 297. If there had been a forgery in this instance, it is probable it would have been brought to light at the time the survey was made : the making of which is the controlling fact with this Court, coming in aid of the certificate of Aguilar. For it must be admitted, that if the unsupported certificate had been brought forward, and the claim for the first time set up under it, in July, 1833, eighteen years after it bears date; that it could not have furnished any foundation for a decree, or been evidence of title worthy of credit. The lapse of time, the silence of the claimant, and her failure to have presented it for confirmation, would, under the circumstances, have been conclusive objections to its credibility. But the existence of the claim in 1821, is rendered certain by the return of the surveyor general; and before the American tribunals it has been steadily pursued.

Furthermore, the presumption that the original memorial and concession, supposed to have been on file in the government secretary's office, have been lost or destroyed, is very strong. After the papers were taken possession of in 1821, by the authorities of the United States, they were almost abandoned, in an open house, subject to the inspection and depredation of every one; many of the files were seen untied, and the papers scattered about the room; the doors and windows of the house being open. There can hardly be a doubt that some of the papers were destroyed or lost.

Nothing is therefore found in the condition of the office, to rebut the prima facie presumption furnished by the secretary's certificate; as might be the case, had the papers been kept with proper care : and especially, had the concessions been numbered, and no number been missing.

The next question is, does the concession carry with it the conditions imposed by law on those having lands given to them for the purposes of settlement? The object of the applicant, Mrs. Wiggins, is distinctly set forth by her memorial; with the number of the family of which she was the head, that is, five children and five slaves, with herself. By the regulations of Governor White, published in 1803, it was declared, that to each head of a family there should be distributed fifty acres; and to the children and slaves, sixteen years of age, twenty-five acres for each one; but from the age of eight to sixteen years, only fifteen acres.

Taking the slaves and children all to have been over sixteen, there being ten of them, would have entitled the applicant to two hundred and fifty acres on their account, and the fifty acres on her own; which would have made up the three hundred acres applied for.

The same ordinance provides, " That those employed in the city,

if lands be granted to them for cultivation, by themselves or their slaves; it shall be with the express condition, that he shall commence cultivation within one month after the concession of them, with the understanding, that if they do not do it, they will be granted to any one who will denounce him, and verbally prove it." And that all concessions, without time specified, shall be void, and held as though not made, if grantees do not appear to take possession and cultivate them within the term of six months.

In the concession to Mrs. Wiggins, no time is specified for the settlement; and the government of the United States may take advantage of the nonperformance of the condition prescribed by law, if the eighth article of the treaty with Spain does not provide for the emission. It stipulates, "that grants of lands made by Spain, before the 24th of January, 1818, shall be ratified and confirmed to the persons in possession of the lands, to the same extent that the same grants would be valid, if the territories had remained under the dominion of Spain."

It was adjudged by this Court, in the cases of Arredondo and Percheman, 6 and 7 Peters, that the words "shall be ratified and confirmed," in reference to perfect titles, should be construed to mean "are" ratified and confirmed, in the present tense. The object of the Court in these cases was to exempt them from the operation of the eighth article, for the reason that they were perfect titles by the laws of Spain, when the treaty was made; and that when the soil and sovereignty of Florida were ceded by the second article, private rights of property were by implication protected. The Court, in its reasoning, most justly held that such was the rule by the laws of nations, even in cases of conquest, and undoubtedly so in a case of concession: therefore, it would be an unnatural construction of the eighth article, to hold that perfect and complete titles, at the date of the treaty, should be subject to investigation and confirmation by this government; and to reconcile the article with the law of nations, the Spanish side of the article was referred to, in aid of the meaning of the American side, when it was ascertained that the Spanish side was in the present tense: whereupon the Court held, that the implication resulting from the second article, being according to the law of nations, that, and the eighth article, were consistent; and that perfect titles "stood confirmed" by the treaty; and must be so recognised by the United States, and in our Courts.

The construction of the treaty being settled, a leading inquiry in the cases referred to was, were they perfect, unconditional Spanish grants?

Percheman's had no condition in it; and the only difficulty involved was, whether it had been made by the proper authority. The Court held it had been so made.

The grant to Arredondo and son was for four leagues square, and made as a present grant from its date; with the subsequent condition that the grantees should settle and improve the land in three

years, and on failure, the grant should become void: further, that they should settle on it two hundred Spanish families; but no time was fixed for the performance of this condition. Possession was taken and improvements made within the three years; but the families were not settled when the country was ceded. This Court declared, that after the cession of Florida to the United States, the condition of settling Spanish families had become, probably, impossible, by the acts of the grantor, the government of Spain; and certainly immaterial to the United States: therefore, the grant was discharged from the unperformed condition, and single.

That the perfect titles, made by Spain, before the 24th of January, 1818, within the ceded territory, are intrinsically valid, and exempt from the provisions of the eighth article, is the established doctrine of this Court; and that they need no sanction from the legislative or judicial departments of this country.

But that there were at the date of the treaty very many claims, whose validity depended upon the performance of conditions in consideration of which the concessions had been made, and which must have been performed before Spain was bound to perfect the titles; is a fact rendered prominently notorious by the legislation of Congress and the litigation in the Courts of this country for now nearly twenty years. To this class of cases the eighth article was intended to apply; and the United States were bound, after the cession of the country, to the same extent that Spain had been bound before the ratification of the treaty, to perfect them by legislation and adjudication: and to this end the government has provided that it may be sued by the claimants in its own Courts; where the claims shall be adjudged, and the equities of the claimants determined and settled according to the law of nations, the stipulations of the treaty, and the proceedings under the same, and the laws and ordinances of the government from which the claims are alleged to have been derived.

These are the rules of decision prescribed to the Courts by Congress, in the act of 1824, ch. 173, sec. 2; passed to settle the titles of Missouri and Arkansas; and made applicable to Florida, by the act of 1828, ch. 70, sec. 6. By the sixth section of the act of 1824, the claimant who has a decree in his favour, is entitled to a patent from the United States; by which means his equitable claim draws to it the estate in fee. These are the imperfect claims to which the eighth article of the treaty with Spain refers.

That a Spanish concession carrying on its face a condition, the performance of which is the consideration for the ultimate perfect title, is void, unless the condition has been performed in the time prescribed by the ordinances of Spain; was decided by this Court after the most mature consideration, in the cause of the United States vs. Kingsley, (12 Peters;) which is the leading decision upon the imperfect titles known as Mill grants; and which has been followed by all others coming within the principles then, with so much care

and accuracy laid down. The concession to Mrs. Wiggins, carrying with it the conditions incident to settlement rights by the ordinances and usages of Spain; a brief notice, in addition to what has already been said, will be taken of the regulations and ordinances governing the case. As, on the first point, the practice of the government in disposing of the public domain, may be proved by those familiar with the customs; and there is in the record, very satisfactory proof by witnesses of the laws and customs governing the provincial authorities in this respect; but as the proof is in exact accordance with the published ordinances on the subject, of course the written law will be relied upon.

After the passage of the act of 1828, it was the opinion of the Attorney General of the United States, that it was indispensable to the correct decision of the Florida claims by the Court, that a correct translation into the English language should be made of the Spanish and French ordinances, affecting the land titles in that country. The task of translating and compiling them was assigned to Joseph M. White, Esq., then of Florida. The collection was accordingly made and translated, and the manuscript deposited in the state department; and Congress was informed of the fact, by a special message from the President of the United States, of February 11th, 1829. 2 White's Recopilacion, 9, 10. It was afterwards published by Mr. White; and latterly he has published a second and enlarged edition, which is the one referred to in this case.

The treaty with Spain for the cession of Florida, was signed 2d February, 1819: on the 25th of November preceding, the political and military governor (Coppinger) caused to be published an ordinance setting forth the conditions on which concessions for settlement claims had been issued; obviously with a view to the future cession. 2 White's Recopilacion, 282—285. From the ordinance it appears, " That concessions made to foreigners or natives, of large or small portions of land, carrying their documents with them, (which shall be certificates issued by the secretary,) without having cultivated or ever seen the lands granted to them, such concessions are of no value or effect; and should be considered as not made, because the abandonment has been voluntary, and that they have failed in complying with the conditions prescribed for the encouragement of population :" " and therefore, there is no reason why they should not revert to the class of public lands, making null the titles of cession which were made to them."

Ten years had been the time required for cultivation and occupation; this rule was not rigidly adhered to, but the titles were perfected in some instances, where valuable improvements had been made, and the occupation had been short of ten years; the governors taking into consideration the disturbed state of the country. These exceptions were abatements of the general rule, requiring ten years cultivation and occupation: as Mrs. Wiggins, however, never cultivated, or occupied the land claimed, she took no interest under the

rule, or any exception made to it ; and it is free from doubt, had Spain continued to govern the country, no title could have been made to her; nor can any be claimed from the United States, as successors to the rights and obligations of Spain.

It is, therefore, adjudged, that the decree below be reversed, and the petition dismissed.

This cause came on to be heard on the transcript of the record from the Superior Court for the District of East Florida, and was argued by counsel. On consideration whereof, it is now here ordered and decreed by this Court, that the decree of the said Superior Court in this cause be, and the same is hereby reversed and annulled; and that this cause be, and the same is hereby, remanded to the said Superior Court, with directions to dismiss the petition.