## JUSTO PINO ET AL. v. ALEXANDER HATCH.

POLITICAL CHIEF, POWER OF, TO GRANT LAND.—The political chief of the province of New Mexico, under the government of Mexico, after the separation from Spain, had no power, without express authority from the Mexican government, to grant away any part of the public domain.

GRANT FROM POLITICAL CHIEF AS FOUNDATION OF PRESCRIPTION.—A grant of land executed by the political chief of New Mexico in 1823, though not sufficient to pass the absolute title, for want of legal authority to make it, is nevertheless admissible in evidence as against one having no better right, to show the time and mode of gaining possession, and the point from which the adverse occupation is to be reckoned.

EVIDENCE OF CUSTOM RESPECTING POSSESSION OF PUBLIC LAND.—Where a plaintiff in ejectment is endeavoring to prove a prescriptive right to land of which he claims to have entered into possession in 1823, evidence is admissible to show what was the custom under the Spanish and Mexican governments with respect to getting possession of the public domain.

DEMURRER TO EVIDENCE.—Where a demurrer to evidence is interposed, the party demurring must admit all the facts which the evidence proves, or conduces to prove, and if there is a disagreement as to the facts, the court can not decide what facts have been proved, and compel the adverse party to join in the demurrer.

GRANT FROM POLITICAL CHIEF PRESUMED VALID.—A grant for a part of the public domain executed by the political chief of New Mexico in 1823 upon a petition of the grantee and with the advice and consent of the provincial deputation, and reciting the fact that it was made pursuant to legal authority, such grant and the possession taken thereunder having remained without objection from the national government for twenty-five years, must be presumed to have been duly authorized and to be valid, at least so far as to confer a possessory title good against all the world except the national government. *Per* Brocchus, J.

RIGHTS UNDER MEXICAN GRANTS PROTECTED BY TREATY.—Property rights acquired under Mexican grants in New Mexico, prior to the cession to the United States, are fully protected by the treaty of 1848, and can not be disturbed. *Per* Brocchus, J.

APPEAL from Santa Fe county. The opinions of the judges state the case.

*Baird and Smith,* for the appellants.

*Ashurst and Watts,* for the appellee.

By Court, Benedict, J.:

This was an action of ejectment brought by the plaintiffs, in the county of San Miguel, under the law which provides that the action of ejectment may be maintained in all cases where the plaintiff is legally entitled to the possession of the premises. The plaintiffs, at the October term, 1853, applied for and obtained a change of venue to the county of Santa Fe. After issue tendered, the record shows many proceedings by the respective parties in the district court, to which the cause was changed up to the June term, 1854, which are not deemed necessary to relate. At this term the cause was submitted to a jury for trial. The object of the plaintiffs was to eject Hatch from a great extent of territory lying in the county of San Miguel, which had been granted, as they claimed, to Juan Esteban Pino, the father of Justo and Manuel, and which by them, since their ancestor's decease, had been transferred to their wives. To show that the grant had been made, the plaintiff offered in evidence a document purporting to have been made to said Juan Esteban by one Bartolome Baca, as political chief *pro tem.* of the province of New Mexico, on the twenty-third of December, 1823. With this was also offered the petition of said Juan Esteban to said Baca, praying for the grant and evidence of its presentation by him to the provincial deputation of the territory and their action thereon. To the introduction of this grant by the political chief and the other documents, the defendants objected, and the court sustained the objection, and refused to permit them to go to the jury. The plaintiffs then strove to prove a prescriptive right to the premises by showing the peaceable possession and enjoyment for twenty years, and offered to ask a witness, Domingo Fernandez, a man of about ninety years of age, what was the custom under the Spanish and Mexican governments of getting possession of the public domain, and the court refused to allow said question to be asked. After the plaintiffs had closed their testimony, the defendants demurred to the evidence, and the court ruled the plaintiff to join in the demurrer on the morning thereafter, and discharged the jury.

A bill of exceptions shows, that after the court had allowed the demurrer to evidence and had ordered the joinder in demurrer, but before the joinder was made, the counsel for plaintiff could not agree with counsel for defendant as to the facts proved, and the court decided what facts had been proved, so far as the dispute was concerned and as to the facts in regard to which counsel on both sides disagreed. After the joinder was made the court found against the plaintiff, and rendered a judgment in favor of the defendant, for costs. The plaintiffs then filed their exceptions and appealed to this court, after having moved in arrest of judgment and been overruled. Among the errors which have been assigned are, that the district court erred in excluding the documentary evidence offered by plaintiffs, in compelling the plaintiff below to join in the demurrer to evidence, and in excluding the evidence as to custom. This cause is one of very great interest, not only from the immense tract of territory embraced in the plaintiffs' claim, but from the principles involved, and the adverse interests of possession and occupancy which have grown up and now exist, as appears by the evidence, upon the same tract. From the direction this case is to take as resulting from the opinion to which the court has arrived, and the peculiar manner in which the record presents the cause before us, we do not deem it necessary to enter into an elaborate discussion to fix and prescribe the principles by which such merits as the plaintiffs may have in the lands claimed, or any part of them, should finally be disposed of. We will, in reviewing the exceptions taken by the plaintiffs to the rulings of the court below, consider, first, the refusal of the court to permit the document offered, to be read as evidence to the jury. It is contended by the counsel for the defendants, that they were properly refused, because it was not shown that the sovereign Mexican authority of that nation, after the declaration of its independence of the crown of Spain, had authorized and empowered the political chief or governor of this province to grant away the public domain. The plaintiffs' counsel contends that they were not required to prove affirmatively that Bartolome Baca had authority as gov-

ernor to make the grant, but such authority is to be presumed from his acts until the contrary is shown by those disputing the grant. No question seems to have been raised that the plaintiffs did not make all the preliminary proof, as to the forms and execution of the deed and documents, to entitle them to offer these in evidence. The question as to the legality of evidence offered by a plaintiff, and his right that the same shall be allowed to go to the jury, and that of the sufficiency of the evidence to make out his case, are clearly distinct. The legality must be determined by the court, the sufficiency by the jury.

It has been conceded in the argument of this cause (and the discussions have been able and luminous), that the territory in controversy was public domain, and belonged to the sovereignty of Mexico when Baca executed the documents. The court takes notice that the United States acknowledged the independence of Mexico, which had been achieved from Spain in 1821. Up to that time, the royal order of the king, by virtue of his prerogative, ruled absolutely in the disposition of the public domain, and in the separation thereof, and in the granting of parcels to individuals. Upon the assertion of these prerogatives in Mexico, the power passed to the sovereignty of the latter country. The supreme court of the United States said, in the case of *Pollard's Lessee* v. *Hagan et al.*, 3 How. 225, asserting the law of nations: "It can not be admitted that the king of Spain could, by treaty or otherwise, impart to the United States any of his royal prerogatives; and much less can it be admitted that they have capacity to receive, or power to exercise them. Every nation acquiring territory by treaty or otherwise, must hold it subject to the constitution and laws of its own government, and not according to those of the government ceding it."

It follows, then, that all power which governors of provinces, intendants, or other persons had to dispose of public domain, by virtue of authority imparted by the king of Spain, ceased upon the independence of Mexico. The sovereignty over the public domain passed from him to the sovereignty of Mexico. The title passed there, and lodged

there, and could not be divested without an authority and under a law. Neither a political chief nor a provincial governor could divest the sovereignty of the soil unless expressly authorized by the new power to do so, or his acts should be subsequently sanctioned by the political authority: See *Jones* v. *Borden,* 5 Tex. 410. Bartolome Baca, if he had the power to grant the title to the premises in question, derived that power from Mexico, for New Mexico at that time was governed as a part of that nation. And, as before remarked, the argument of the cause has proceeded upon the conceded ground that the sovereignty of the public domain in the province was in Mexico. No one has urged that this domain had become the property of the province, and could have been divested without the authority of Mexico.

But suppose, for the sake of the argument, the ground is assumed as invulnerable that Baca had not been empowered to grant the title to the premises, ought the court to have permitted the documents to have gone to the jury? We think it should. The rule of Spain had been driven from the country. Mexico herself was passing through tumults and revolutions. The Mexican confederation had not then been formed. The next year, after Baca's grant, the federal constitution was established. The government of this province, as proven by witness Vigil, had been turned over to the republic of Mexico in 1821. Baca describes himself as having been assisted by a provincial deputation. They doubtless had the power, and did exercise the functions to regulate (and to what extent is not now essential to inquire), the internal affairs of the province and preserve the public peace. If they had not the legal authority to grant the title and fee-simple in the public domain, we must concede to them as having had the power to regulate the possession and prescribe rules for the occupancy of the domain. The very necessity growing out of the condition of the inhabitants, their wants and welfare, presumes that power to have existed. The use of the soil for settlement, improvement, and cultivation, and for the erection of establishments for mechanical purposes, could have been properly granted: See 2

How. (U. S.) 603. The documents, to give them no other right, would have aided the plaintiffs in showing the time when and the manner in which their ancestor gained possession of any portion of the premises claimed, and the point of time from which the prescription they strive to prove, as the rancho was actually occupied, began to run as against all individuals not having a higher claim to the possession. This court is fully aware of the importance of giving full effect to the laws in this territory, which bind the courts to protect the rights of possession, improvement, and occupancy, *bona fide* and peacefully acquired. During the investigation of this case, it was in the contemplation of a majority of the court, at least to make a rigid analysis of the documents, and define from the results to which our minds have arrived the entire legal effect we think they should have in the determination of this cause by a jury. Upon more mature deliberation, however, we think it proper to refrain from embodying in this opinion our conclusions upon that point further than is necessary in disposing of the exceptions taken by the plaintiff. To go further we are not required, and, should we, it might be improperly invading the trial below, should an adjudication of the legal effects and sufficiency of the documents be had.

We turn now to the consideration of the exception to the ruling of the court in refusing the evidence as to custom; the plaintiffs now trying to prove a prescriptive right to a tract of land which Juan Esteban Pino has, as the proof showed, for a long time occupied. If there was a custom in the Spanish and Mexican governments of getting possession of the public domain, we think the plaintiffs should have been permitted to prove such custom by parol testimony. We are not aware of the rule which would have excluded that proof. At the time referred to they were foreign governments as to us. To quote no further authority, the United States supreme court say, in the case of *The United States* v. *Wiggins*, 14 Pet. 334, " the practice of the government in disposing of the public domain may be proven by those familiar with the custom," and this referred to the disposition made by Spain. If such practice could be proven by

parol, surely the custom of obtaining possession could be so proven. We come now to the exception to the ruling of the court in the demurrer to the evidence. This point has been very lucidly argued by the respective counsel. We are inclined to believe that the record does not show the whole of the facts as they occurred below; but, be that as it may, we are confined to it as it stands before us. On the practice of demurrers to evidence there are reported many adjudicated cases, and seldom without language of marked condemnation; yet when such course is taken by the counsel, the court has but its plain duty to perform, which is to decide all points touching such demurrers as shall be presented in such manner as it shall understand itself to be required by law. A peculiar point is presented in this bill of exceptions, and has been much dwelt upon in argument. It is important that this be disposed of. After the plaintiffs had been ruled to join in demurrer, it seems that a dispute arose between the counsel of the respective parties as to the facts proven, and, they not being able to agree, the court decided what facts had been proven. So far as the dispute was concerned, and as to the facts in regard to which counsel on both sides disagreed, the record does not inform us what the disputed facts were—neither as to number, kind, or importance; but it does show a dispute, and that it was not settled by the parties, and that the court did decide what facts were proven, and upon such decision compelled the plaintiffs to join in demurrer.

It may be proper here to inquire into the nature of a demurrer to evidence. In *Young* v. *Black*, 7 Cranch, 565, the supreme court say: "A demurrer to evidence is an unusual proceeding, and is allowed or denied by the court in the exercise of a sound discretion, under all the circumstances of the case. The party demurring is bound to admit as true, not only all the facts proved by the evidence introduced by the other party, but also all the facts which that evidence legally may conduce to prove. It follows that it ought never to be admitted, where the party demurring refuses to admit the facts which the other side attempts to prove." The same court says, in *The Bank of the United States* v. *Smith*, 11

Wheat. 171: "By this demurrer the defendant has taken the questions of fact from the jury, where they properly belonged, and has substituted the court in the place of the jury, and everything which the jury could reasonably infer from the evidence demurred to is to be considered as admitted." The language of adjudged cases on this subject is very strong, to show that the court will be extremely liberal in their inferences, where the party demurring will take the question from the proper tribunal. It is a course of practice, generally speaking, that is not calculated to promote the ends of justice. In *Fowle* v. *Common Council of Alexandria*, 11 Wheat. 320, the court say, "that it is no part of the object of the proceedings (demurrer to evidence) to bring before the court an investigation of the facts in dispute, or to review the force of testimony or the presumptions arising from the evidence; that is the proper province of the jury. The true and proper object of such a demurrer is to refer to the court the law arising from the facts. It supposes, therefore, the facts to be admitted, and as ascertained, and that nothing remains for the court but to apply the law to the facts." This doctrine is clearly established by authorities, and is expounded in a very able manner by Lord Chief Justice Eyre, in delivering the opinion of all the judges in the case of *Gibson* v. *Hunter*, 2 H. Bl. 187, before the house of lords. It was there held that no party could insist upon the other party's joining in demurrer, without distinctly admitting upon the record every fact and every conclusion which the evidence given for his adversary conduced to prove. If, therefore, parol evidence is given in the case, it is loose and indeterminate, and may be applied with more or less effect to the jury as evidence of circumstances which is meant to operate beyond the proof of the existence of those circumstances, and to conduce to the proof of other facts. The party demurring must admit the facts of which the evidence is so loose, indeterminate, and circumstantial, before the court can compel the other side to join therein.

In this case we are compelled to regard the defendant as not admitting upon the record all the facts contended for by the plaintiffs. We are not prepared to say that the plaintiffs'

counsel acted captiously in the dispute. It seems of so grave a nature that the court interposed and decided the facts. This decision of the court seems to be at variance with the opinions above quoted. We are unable to find an adjudged case, in which the court has in such instance exerted such power. We think it was not its province to decide what facts had been proven, and that it erred in doing so, and then compelling the joinder. It had ample power to dispose of the contumaciousness of the plaintiffs, if any existed. The exceptions do not show which party originated the disagreement, nor in whose favor the court decided the facts. It is impossible to know how differently the proof would appear in the record, had not such decision been made, nor what effect it may have had upon the final determination of the cause. It was the province of the court, not to find the facts, but to apply the law. In conclusion, we think proper to state, that we express no opinion as to the points much disputed in argument as to the evidence tending to show Hatch to be upon the actual rancho of Pino. His counsel so placed his case that all inferences which a jury could reasonably draw must be taken against him, and all that was loose, circumstantial, and indeterminate he was bound to admit against himself. Taking the whole of this case as it appears to us from the record, we think it should be sent down to the district court to be tried *de novo.* Let the judgment be reversed.

BROCCHUS, J., dissenting:

I coincide with the reasoning of the opinion which has been read, on a majority of the points discussed, and concur fully in the judgment of the court on all the points involved, so far as it reverses the ruling of the court below and remands the cause for a new trial. I regret, however, to have to feel it my duty to deliver a separate opinion on the most important question involved in the case. I allude to the grant or deed offered by the plaintiffs in the court below as evidence to maintain their action, and by the court excluded from the jury, as complained of in the third bill of exceptions. In deciding that the court below erred in

refusing to allow that grant to go to the jury, it seems proper that some reasons should be assigned showing that the grant, when it shall be brought to the consideration of the jury in the new trial, is to have some force and effect, and to indicate the principles which ought to govern the construction thereof when it shall come to be considered as evidence in the court below. I have to regret that in this view of the duty of this tribunal, I stand unsupported by the other members of the court.

This grant appears to have been executed by Don Bartolome Baca, as supreme political chief of the province of New Mexico, under the supreme national government of the republic of Mexico, with the consent of the national deputation of the province. It comes before us, as it was before the court below, as a duly authenticated copy of the original, bearing the appearance of genuineness, and seeming to have been executed in due accordance with the forms, ceremonies, and solemnities of the law. This document of concession grants to Don Juan E. Pino a certain extensive tract of land lying within the territory of New Mexico, the metes and bounds whereof are therein described, embracing, as it is alleged, the ranch occupied by Alexander Hatch, for the possession of which this action of ejectment was instituted in the court below. The plaintiffs in the original cause are the lawful heirs of the grantee, Don Juan E. Pino, and in the action of ejectment offered this grant as evidence of their right to recover possession. The said grant having been rejected by the court below, the plaintiffs have brought the question of its validity to this appellate tribunal. The question is one of a very delicate and important character, and in view of the importance of the principles involved, the extent of property depending on the result of this cause, and the effect which the final adjudication of this question must have upon the real estate of a large portion of the people of this territory, it is natural that I should experience some regret in differing from a majority of the court in the opinion which I entertain in reference to this most interesting and important branch of the case.

In the investigation of the character of the grant in question, and in the application thereof to this case, we must inquire, has it emanated from a proper source? Is it duly authenticated? What is its legitimate force and effect, and is it such a grant as should command the protection of the courts of the country? It is an undisputed and admitted fact, that Don Bartolome Baca, the grantor, was at the time of the making of the said grant the duly authorized political chief of this, the then province of the republic of Mexico, to whose wisdom and care, under the advice of the provincial deputation, was confided the government and the interests of this province. It is before us upon the record, that the grantee, Don Juan E. Pino, on the sixth day of December, 1823, petitioned the said political chief for a grant of the tract of land described in the document of concession, the petitioner setting forth in the petition, the uses and purposes to which he desired to appropriate the tract of land for which he petitioned. Those uses were the cultivation of the soil, the pasturing of flocks, the promotion and encouragement of industrial pursuits, and in general such purposes as looked to the settlement of the uninhabited portions of the province, the enhancement of the value of the soil, the development of the resources of the country, and the promotion of the public good. It further appears that the said petition was referred by the said political chief, Don Bartoleme Baca, to the provincial deputation of the province, for their advice and consent, it seeming clearly to have been the duty of said provincial deputation to counsel and advise with the said political chief in relation to the propriety and wisdom of making such grants. It further appears that the said provincial deputation, having duly considered the matters set forth in the petition thus referred to them, gave their agreement and assent to the concession of the lands petitioned for, and that then, and not until then, the said political chief, in the name of the supreme national government, made to the petitioner, Don Juan E. Pino, a grant of the tract of land for which he petitioned, and for the purposes for which the said grant was sought.

It has already been remarked that the grantor, Don Bartolome Baca, was the undisputed and admitted political chief of the province of New. Mexico at the time of making such grant. He held that office under the republic· of Mexico and it was in that capacity that he made to Don Juan E. Pino the grant in·question. It is to be presumed that all of his official acts were legitimate and in conformity to the will of the law of· the sovereign power under which he exercised his authority. Such must be the rational and legal presumption, until it be shown that he transcended his powers, or acted in violation of laws bearing. upon the subject. The presumption that he acted within the legitimate scope of his authority, in making the grant, derives strength from the circumstances attending the concession of the land from the incipiency to the consummation of the grant. In the first place, let us look at the petition of the party seeking the grant. It is apparent from the form of the petition, the consideration therein set forth, and the motives by which it was obviously incited, that the petitioner acted under full conviction that he was applying to the true and lawful authority for. the desired grant. The reference of the petition by the political chief to the provincial deputation, indicates that the said functionary was disposed, like a faithful public officer, to proceed with due deliberation, care, and wisdom, in the discharge of a delicate and important public duty. The deliberations of the provincial deputation, and their final assent to the concession of the land in conformity to the prayer of the petitioner, the acceptance of the task devolved upon them by the reference of the petition to their investigation, deliberation, and counsel, and their response in advising the political chief to make the solicited grant, indicate that they were acting in conformity to law, and that the political chief, with whom they thus counseled and advised, acted in pursuance of legal authority, in referring the case to their consideration and in ultimately making the concession. The presumption in favor of the legality of the act of making the grant derives additional strength from the considerations which moved the grantor

thereto. In doing the act, he seems to have been influenced by motives that looked to the public weal, such as the population of the unsettled portions of the province, the cultivation of the soil, the enhancement of the value of the adjacent lands belonging to the public domain, the development of the resources of the country, and other benefits to the general interest of the province, which would legitimately flow from a settlement of the uninhabited portions of the territory and a spread of industrial pursuits. It is apparent that the considerations which moved the grantor in making the grant were founded in a desire to stimulate the dormant energies and develop the latent resources of the country. In this he seems to have acted the part of a faithful public officer, looking not only to the welfare of the province over which he presided, but also to the interest and aggrandizement of the supreme national government, under whose authority he held his office and in whose name he executed the grant.

These considerations go strongly to support the presumption that Don Bartolome Baca, as political chief of the province, made this grant by virtue of authority in him duly vested by the supreme national government of Mexico. This presumption is favored by the declaration in the document of concession that he made the grant by virtue of the authority upon him conferred, and in the name of the supreme national government. This grant appears from the record to have been made in the year 1823, twenty-five years before the republic of Mexico parted with the right of soil, and her political authority over this territory, wherein the land in question lies, and where the grant thereof was made. The act of granting this land was, of course, a public proceeding. The record thereof passed to the archives of the government, and it is to be presumed and admitted that such official functions, when exercised by the high public authorities of the provincial government, were not unknown to the supreme national authority. It is not to be supposed that a nation would establish within her own domains a provincial or subordinate government, appoint officers thereto, and devolve upon them the responsible duty of managing

the affairs and superintending the interests of that subordinate government, without taking cognizance of the important acts of its functionaries.

It appears, then, that the supreme national government of Mexico acquiesced in the act of its subordinate authorities in this province, in making the grant of land here in question, for the lapse of about twenty-five years. We are to construe the silence of the supreme authority·in regard to the public acts of its subordinate authorities into an affirmation or approval of those acts. It has not been shown that the supreme national government did any act, passed any law, or issued any edict disavowing grants made in this manner and by these authorities. It does not appear that anything has been done by the national government of Mexico tending to indicate that she disapproved of such proceedings; but, on the contrary, those functionaries were permitted for years to go on uninterruptedly in the exercise of such powers. By virtue thereof, countless tracts of land are now possessed by the inhabitants of this territory, who will tremble in their homes, hitherto deemed permanent and secure, when they shall have learned, from the intimation of this court, by how frail a tenure, in the opinion of this tribunal, they hold their possessions. The purposes for which such grants as the one in question were made, being such as look to the welfare of the province, the development of its resources, and consequently to the interest and greatness of the supreme government, give encouragement and strength to the idea of presumed acquiescence on the part of the superior power.

After the lapse of nearly twenty-five years from the period of this grant, this territory passed from the ownership of Mexico into that of the United States, and in the transition from the jurisdiction and authority of the old government to those of the new, the plaintiffs brought with them this grant, which had been respected and maintained inviolate for nearly a quarter of a century, and they now ask us if we will not recognize as lawful and valid an act from a high official source, which for so long a period had the unreserved acquiescence of their former sovereign. The supreme court

of the United States, in the case of *The United States* v. *Arredondo et al.*, 6 Pet. 691, recognize the principle as to all public grants of lands or acts of public officers in issuing warrants, orders of survey, permission to cultivate or improve, as evidence of inceptive and nascent titles. That the public acts of public officers, purporting to be exercised in an official capacity and by public authority, shall not be presumed to be usurped, but a legitimate authority, previously given, or subsequently ratified, which is equivalent. In that case it is said, "if it were not a legal presumption that public and responsible officers, claiming and exercising the right of disposing of the public domain, did it by order and consent of the government in whose name the acts were done, the confusion and uncertainty of titles and possessions would be infinite." The same case, page 723, says: "The grants of colonial governors, before the revolution, have always been and yet are taken as plenary evidence of the grant itself, as well as authority to dispose of the public lands. Its actual exercise, without any evidence of disavowal, revocation, or denial by the king, and his consequent acquiescence and presumed ratification, are sufficient proof, in the absence of any to the contrary (subsequent to the grant), of the royal assent to the exercise of his prerogative by his legal governors. This or no other court can require proof that there exists in any government a power to dispose of its property. In the absence of any elsewhere, we are bound to presume and consider that it exists in the officers or tribunal who exercise it by making grants, and that it is fully evidenced by occupation, enjoyment, and transfers of property, had and made under them, without disturbance by any superior power, respected by all coordinate and inferior officers and tribunals throughout the state, colony, or province where it lies."

The government of the United States, in all the special legislation which it has had in reference to grants by the former sovereign of portions of the domain over which she has subsequently acquired authority and jurisdiction, has always recognized the principle here insisted upon, and in the same case, *United States* v. *Arredondo and others*, the

supreme court of the United States says, in allusion to such legislation by congress, that "in their whole legislation on the subject (which has been examined), there has not been found a solitary law, which directs that the authority on which a grant has been made under the Spanish government should be filed by a claimant and recorded by a public officer, or submitted to any tribunal appointed to adjudicate its validity and the title it imparted. Congress has been content that the rights of the United States should be surrendered and confirmed by patent to the claimant under a grant purporting to have emanated under all the official forms and sanctions of the legal government. This is deemed evidence of their having been issued by proper, lawful, and legitimate authority, when unimpeached by proof to the contrary."

In the same case the court say: "The judicial history of the landed controversies under the land laws of Virginia and North Carolina, as construed and acted on within those states, and in those where the land ceded by the states to the United States lie, and Pennsylvania, whose land tenures are very similar in substance, in all which the origin of titles is in very general, vague, inceptive equity, will show the universal rule that the acts of public officers, in disposing of public land by color or claim of public authority, are evidence thereof until the contrary appears by the showing of those who oppose the title set up under it, and deny the power by which it professed to be granted. Without the recognition of this principle there would be no safety in title papers and no security for the enjoyment of property under them. It is true that a grant made without authority is void under all governments: 9 Cranch, 99; 5 Wheat. 303; but, in all, the question is on whom the law throws the burden of proof of its existence or non-existence. A grant is void unless the grantor has the power to make it, but it is not void because the grantee does not prove or produce it. The law supplies this proof by legal presumption, arising from the full legal and complete execution of the official grant under all the solemnities known or proved to exist,

or to be required by the law of the country where it is made
and the land is situated."

The grant in this case comes before us with all the ap-
pearances of having been executed in conformity to the
solemnities and sanctions of law.   In that respect it stands
unimpeached.    In view of the foregoing reasoning and
authorities cited, it is clear to my mind that this grant must
be respected as having emanated from a lawful source, such
as would be recognized by congress in legislation upon the
subject, and of which the courts can not be regardless.    If
the authority by which the grant was made is to be viewed
as legitimate and binding, let us inquire what is the charac-
ter and extent of the rights thereby vested in the grantee.
It is obvious that the designs of the grantor were to give to
the grantee, not a mere possessory right, but a permanent
right to the land granted.    This intention is evinced and
undoubtedly indicated by the instructions or requirements
of the document of concession, wherein the grantor says:
" I have thought proper to grant, in the name of the supreme
national government, to Don Juan E. Pino, and by this
document of concession, the site which he solicits, on the
river Gallinas, which shall be called Hacienda de San Juan
Bautista del Ojito de las Gallinas, with the known bound-
aries on the north of the landmarks of the site of Don
Antonio Ortiz and the mesa of the Aguage de la Yegua; on
the south the river Pecos; on the east the mesa of Pajarito;
on the west the points of the mesa Chapamius; in which
fixed points he shall place formal and well-constructed
landmarks, so that in all time the dividing lines of the
lands which have been granted to him may be recognized,
in order that in conformity with the laws now in force, or
that may be in force, he may enjoy them for himself and
his legitimate heirs."

It is not, however, necessary, in view of the bearing
which this grant should have in the court below, in the
action of ejectment, to determine whether the effect of the
grant was to vest in the grantee a title in full property to
the land therein embraced, or only the right to settle and
possess.    That the grant was sufficient to vest in the

grantee the right to settle and possess, there can be no rational doubt, and there can be no more reason for uncertainty and doubt as to the quantity of land or the extent of the tract over which the right of the grantee was carried. This right of possession was to the whole of the lands within the boundaries laid down and described in the grant. The possession of a part of the tract was in legal contemplation a possession of the whole, to the effect that all other persons entering thereon without a higher and better right, derived from public authority, from the grantee himself or those holding under the grant, would be there as mere trespassers.

It appears from the evidence that the grantee did take possession of the tract of land by the erection of buildings and actual occupancy of the same. His right of possession thereby became perfected, and it was by virtue of that right that the action of ejectment was brought in the court below. Is the right thus acquired such as the courts of our country should protect? It is a humane and just principle of the law of nations that even in conquest private and individual rights of property are not disturbed in the passage of the conquered country from the old to the new sovereign. The conqueror seizes on the possession of the state and the public property, while private individuals are permitted to retain theirs. They suffer but indirectly by the war, and the conquest only subjects them to a new master: Vat., Law of Nations, b. 3, c. 13, sec. 200. The supreme court of the United States, in the case of *United States* v. *Percheman*, 7 Pet. 86, say it may not be unworthy of remark, that "it is very unusual now in cases of conquest for the conqueror to do more than to displace the sovereign, and assume dominion over the country. The modern usage of nations, which has become law, would be violated; that sense of justice and of right which is acknowledged and felt by the whole civilized world, would be outraged, if private property should be generally confiscated and private rights annulled. The people change their allegiance; their relation to their ancient sovereign is dissolved; but their relation to each other and their rights of property remain undis-

turbed. If this be the modern rule, even in cases of
conquest, who can doubt its application to the case of
amicable cession of territory?"

But independent of this general principle, it is expressly
stipulated between the United States of America and the
Mexican republic in the treaty of Guadalupe Hidalgo,
article 10, "that all grants of land made by the Mexican
government, or by the competent authorities in territories
previously appertaining to Mexico, and remaining for the
future within the limits of the United States, shall be
respected as valid to the same extent that the same grants
would be valid if the said territories had remained within
the limits of Mexico." By the same treaty it is also stipu-
lated that "Mexicans now established in territories pre-
viously belonging to Mexico, and which remain for the
future within the limits of the United States, as defined by
the present treaty, shall be free to continue where they now
reside, or to move at any time to the Mexican republic, re-
taining the property which they possess in said territories,
or disposing thereof and removing the proceeds wherever
they please:" Id., sec. 8. The term property here is to be
taken in the most general and liberal sense, as applying to
lands as well as to movable possessions. By the word
property, as applied to lands, is comprehended every species
of title, inchoate or perfect, embracing all those rights which
lie in contract, those which are executory as well as those
which are executed. In this respect the relation of the
inhabitants to the government is not changed: *Smith* v.
*The United States,* 10 Pet. 326.

The scrupulous care and fidelity which our government
intended to maintain in regard to the rights of property of
the inhabitants of this territory is further evinced by the
duty assigned to the surveyor-general of the territory in the
law creating that office, wherein it is made the duty of that
officer to ascertain the origin, nature, character, and extent
of all claims to lands under the laws, usages, and customs
of Spain and Mexico, and to make a full report on all such
claims as originated before the cession of the territory to
the United States by the treaty of Guadalupe Hidalgo, of

1848, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States: Statutes at Large, 1853–1854, Sheet Acts, 309.

It thus directly appears by the treaty stipulations between the United States and the republic of Mexico, and by the subsequent legislation of congress, that all rights of property of every description appertaining to the citizens or inhabitants of the territory previous to its cession to the United States, were to be sacredly respected and inviolably maintained. Thus do whatever rights were acquired by the plaintiff in this suit by virtue of the grant of the political chief of this province, stand securely panoplied against all invasion, and, although congress has thought proper to make itself the judge of the validity of such grants, it is the duty of the courts of the territory to give to the parties claiming under them such protection as the law and equity of their respective claims demand, until their rights shall have been finally determined by the government of the United States. Without deciding whether the grant in question in this case gave to the grantee a title in full property to the tract of land therein described, it is unquestionable that it invested him with a right of possession to the whole tract, which could not be defeated by any but the lawful authority in the annulment or disavowal of the grant. In the absence of any evidence of the annulment, revocation, or disavowal of the act by the supréme national government of Mexico, it must stand as evidence of the right of possession of those claiming under or by virtue of the grant. The action of ejectment is purely a possessory remedy. Its whole object is to put the party claiming possession into the enjoyment thereof. A judgment in ejectment is a recovery of the possession, without prejudice to the right, however it may appear afterwards, even between the parties: Adams on Ejectment, 32; *City of Cincinnati* v. *the Lessee of White,* 6 Pet. 431. Such was the character of the action in the court below. The plaintiffs sought to recover possession, and offered this

grant as evidence of their right of recovery. The grant distinctly defines by prominent and enduring natural objects, the metes and bounds of the tract of land which it purports to convey. These objects still exist, and are as distinctly marked now as they were at the time at which they were mentioned in the deed of concession, so that there can be no doubt as to the precise boundaries within which the grant lies.

It was proved on the trial, as appears from the evidence on record, that the ranch occupied by the defendant, Alexander Hatch, was within those metes and bounds. If the grant is worth anything more than a blank sheet of paper as an instrument, tending to clothe the plaintiffs with a possessory right; if it is sufficient to give them a right of possession to one foot of the land, it is ample for the purpose of giving possession to the whole, and sufficient to maintain the action of ejectment against all other persons entering thereon who can not show a better right. The defendant in the court below did not prove, or attempt to prove, a better right, and in the absence of such proof this grant (had it been permitted to go to the jury), aided by the other testimony adduced on behalf of the plaintiffs, should have enabled them to recover.