## W. S. Wright & Co. v. Hogan & Tureaud et al.

A sale will not be set aside on the ground that it was made in fraud of creditors, by one in insolvent circumstances, where it was made openly, for a fair value, and with the knowledge of several of the creditors, although the sale was of the vendors entire stock of goods.

APPEAL from the Sixth District Court of New Orleans, Cotton, J. Durant & Horner, for plaintiffs. Roselius, Durell, Grivot and Breaux, for appellants.

Voorhies, J. (Lea, J., dissenting—Merrick, C. J., took no part in this decision). This is a revocatory action. The plaintiffs allege that the commercial firm of Hogan & Tureaud, now in liquidation, are indebted to them on two promissory notes, one for the sum of $192 89, with 7 per cent. per annum interest from the 4th of March, 1853, and the other for the sum of $203 43, with like

interest from the 4th of January, 1854; that sometime in January, 1852, the plaintiffs, with many other creditors, agreed to grant an extension of time to said *Hogan & Tureaud*, then embarrassed in their business, and received in payment of their claim the notes sued upon; that *Jeremiah S. Hogan*, intrusted with all the assets, proceeded to liquidate the affairs of the partnership, and paid about fifty per cent. on account of their claim, which originally amounted to $608 91; that after the dissolution of the partnership, *Hogan* also carried on business in his own name, and had on hand at the time of his last payment to them, a large stock of hardware and other goods which had been left with him by the creditors and his retiring partner, that he might sell and convert the same into money and pay the creditors of *Hogan & Tureaud* their instalments as they matured; that prior to the maturity of the third instalment *Hogan* sold out all the stock in trade remaining in the store to *Samuel Lock*, into whose employ he shortly afterwards entered as clerk or salesman; that said *Hogan & Tureaud* have neither voluntarily surrendered their property to their creditors nor have they been proceeded against for a surrender under the provisions of the Act of the 28th of March, 1840; that at the time of said sale *Lock* was a heavy creditor of said firm, then utterly insolvent; that in making said sale the intention of *Hogan* was to withdraw and screen said goods from their pursuit and the pursuit of the other creditors of *Hogan & Tureaud*; and that *Lock*, cognizant of all these facts, made the purchase with the fraudulent design of procuring an unjust preference over the other creditors and securing his own claim against *Hogan & Tureaud*. They, therefore, pray that the firm of *Hogan & Tureaud* be condemned to pay them the amount of said promissory notes, interest and cost of protest; that the said sale from *Hogan* to *Samuel Lock* be decreed to be null and void; that the property thus sold be decreed to be subject to their execution, *and the said Jeremiah S. Hogan be decreed guilty of fraud, and dealt with in manner and form as provided by law*; that defendants be condemned, *in solido*, for costs, and pray for all further general and equitable relief.

The answer of *Samuel Lock* contains a general denial, and an admission that he did, in the winter of 1853, purchase of *J. S. Hogan*, his co-defendant, a quantity of hardware, which said purchase he alleges to have been made legally and for a good and lawful consideration, and without any fraud or shadow of fraud, as falsely alleged.

In his answer, *Hogan* also pleaded a general denial, except the sale to *Lock*, which he admitted to have been made in good faith; that said plaintiffs were aware of the sale being made, and have acted through malice in making false and unfounded charges to their personal knowledge, and done for the purpose of injuring, if possible, his reputation in the community.

Upon the pleadings and evidence adduced the case was submitted to a jury, who returned a verdict in favor of the plaintiffs for the amount of their claim against the firm of *Hogan & Tureaud*, declaring the sale from *Hogan* to *Lock* to be null and void, and the property sold subject to their execution, and *Jeremiah S. Hogan* guilty of fraud, etc. From a judgment thereon rendered by the court below against the defendant, whereby *Jeremiah S. Hogan* was also condemned to two years imprisonment in the parish jail, said *Hogan* and *Samuel Lock* have taken the present appeal.

The alleged agreement between *Hogan & Tureaud* and their creditors is in the following words:

We, the undersigned creditors of *Hogan & Tureaud*, agree to grant them the following extension, viz: in all of the month of March, 1852, 25 per cent.; in all of the month of January, 1853, 25 per cent.; in all of the month of March, 1853, 25 per cent.; and finally, 25 per cent. in all of the month of January, 1854, with interest at the rate of 7 per cent. per annum; this not binding on any unless every creditor comes into the above arrangement.

This instrument appears to have been executed in January, 1852. Shortly afterwards *Tureaud* retired from the firm and *Hogan* continued to carry on the business in his own name and on his own account, purchasing goods from time to time to keep up his assortment, and to liquidate the business of the partnership. In June following, an inventory of the goods of the firm was taken, and amounted to the sum of $14,434 11, at cost price, exclusive of $4963 15 for ploughs held on consignment for sale. When *Hogan & Tureaud* established their firm they owned no capital. *Mr. Thibaut* aided them by endorsing their notes—so did *Mr. Tureaud*, of St. James. The notes thus endorsed by *Thibaut*, and discounted by the banks, at the time of their suspension amounted to between $5000 and $7000, and were to be paid in full, according to the understanding of the parties. Independently of these notes, the liabilities of the firm amounted to about $30,912 70. The loss sustained by bad debts was about $10,000. It does not appear that any other assets belonged to the firm than those set forth in the above inventory at that date.

As evidence of fraud on the part of both *Hogan* and *Lock*, it is argued by the plaintiff's counsel that *Lock* was a creditor of *Hogan & Tureaud* at the time of the respite for $2554 68; and, from the 1st of January, 1852, was familiar with their whole business relations; that he was compelled, under an execution, to pay *Twibill & Edwards*, as endorser, the note of *Hogan & Tureaud* for $775 93; that he was continually dealing with *Hogan*, selling him goods and taking his notes; that he finally took *Hogan* into his employ; that under his influence and advice, his notes, given in part payment of the sale to him, were given in payment to *Busby & Little* for a debt due by *Hogan* individually; and that some time after the suit of *Twibill & Edwards* had been brought against him, he consummated his bargain with *Hogan* by paying *McNeely* two of these notes.

We are of opinion that the charge of fraud is unsupported by the evidence. Finding himself unable to continue business any longer with a reduced stock, an impaired credit and a heavy annual expense for rent, salaries of clerks, &c., *Hogan* made known his condition to several of the creditors of *Hogan & Tureaud*, and his intention to sell out. Some of them advised, but none of them appear to have disapproved of his determination. His negotiation with *Lock* for the sale of the goods was openly spoken of previous to the date of the sale: *Lock* appears to have communicated his intention to make the purchase to some of the creditors, and his inducement for doing so. After the contract was concluded between the parties, it took four or five weeks to make the inventory of the stock, and this to the knowledge of several of the creditors who occasionally visited the store during that time. The inventory of the goods, at cost price, amounted to $7965 85, which appears to have been paid as follows, to wit: ten notes, each for $517 57, dated the 10th of March, 1853, drawn by *Lock* to his own order, and endorsed by him and payable at 12, 18, 24, 30 and 36 months; three notes given by *Hogan* for goods sold to him by *Lock* after the dissolution of the firm, amounting to $1295 90. And here it may be observed, as we infer from the evidence, that *Lock*, in common with the other creditors, *Vredenburg*,

*Folger, David, Wright* and *Sturtevant,* sold goods to *Hogan* for the purpose of enabling him to carry on his business successfully; and, as all the others have been paid in full, we see no good reason why he should not also be paid. The other items completing the price, are satisfactorily accounted for. *Tureaud,* sworn on behalf of the plaintiffs, says, " I suppose *Hogan* sold out at cost; hardware is an article always worth first cost. I have bought at two and a half years credit; it is the usual way when parties sell out at cost." *Bacchus,* one of the creditors, testifies that " *Hogan's* stock was much broken ; that a *discount* on the cost prices would be a *fair* price for it." *Lock,* it appears, intimated to some of the creditors, that he was induced to buy out *Hogan* in order to employ him as a salesman in his store to extend his business with the planters, with whom *Hogan* had a large acquaintance, and would draw him a good deal of custom, but did not want the goods if *Hogan* could make some other disposition of them. But it is said that *Lock* was a heavy creditor of *Hogan & Tureaud,* and made the purchase with the fraudulent design of procuring an unjust pre-ference over the other creditors in the payment of his claim. This allegation appears to be unsupported by the evidence. It is true that *Lock,* as one of the parties to the agreement with *Hogan & Tureaud,* was put down for three dif-ferent sums, namely: $775 93, $685 10 and $1093 45, evidenced by three promissory notes; but it appears that the two last mentioned notes were held by the Mechanics' & Traders' Bank. *Leonard Sturtevant,* one of the creditors, testifies " that one of the amounts due *Lock,* which he thinks was the second one, was paid in the Mechanics' Bank, thinks he assisted *Hogan* in taking it up, by lending him $129, or thereabouts. The note was taken up because *Vreden-burg, one of the directors* of the bank, and one of the plaintiffs against the same defendants, said it was impossible for *Hogan & Tureaud* to resume till it was taken up, &c." The certificate of *G. Cruzat,* commissioner, shows that the fol-lowing notes were paid in the Mechanics' & Traders' Bank on the 28th of January, 1852 : " *Hogan & Tureaud's* note, order of *Lock,* due 19th January, 1852, $1093 65 ; *Hogan & Tureaud's* note, order of *Samuel Lock,* due 28th of January, 1852, $685." We think it is not unreasonable to infer that both these notes were taken up by *Hogan;* at all events, it does not appear that *Lock* ever took up either of them. In relation to the note of $775 93, it is shown that *Lock* had transferred the same to *Twibill & Edwards,* who have received from *Hogan* the two first instalments on account thereof. On the 15th of July, 1853, *Twibill & Edwards* recovered a judgment against *Lock,* as endorser, for the re-maining instalments due on this note. Thus it is evident that *Lock* was not a creditor of the firm of *Hogan & Tureaud* at the date of the sale, as alleged by the plaintiffs. Whether the notes given as the consideration of the sale were misapplied by *Hogan* or not is a matter in our opinion which cannot affect in any manner the validity of the sale. But was there any such misapplication ? We think we are fully authorized, by the evidence, to answer this question in the negative. Although no inventory was taken when the respite was granted, yet we think there is sufficient evidence in the record to enable us to arrive at an approximate invoice value of the goods then on hand. The inventory at the time of the sale, as we have seen, amounted to $7965 85. Deducting therefrom $781 69, the amount paid *Robb* by *Lock* for goods on account of *Joshua Schole-field & Son,* then lying in the Customhouse and included in the purchase, there remained then in the store $7184 16. The stock had then been reduced by sales from June, 1852, to February, 1853, to $7184 16. Supposing *Hogan* to have

made corresponding sales during five months, from the date of the respite to that of the inventory of June, 1852, he would have sold goods invoiced approximating to the sum of $5191 85. Adding this to the inventory of June, 1852, would amount to $19,625 96, as the invoice value of *Hogan & Tureaud's* stock at the date of the respite.

Under the agreement it is evident that the creditors acquired no other privilege or lien on the stock of *Hogan & Tureaud*, their debtors, than that which the law had already conferred upon them. After the dissolution of the partnership, we think it may be fairly inferred from the testimony of *Tureaud*, that his partner *Hogan* was fully invested, if not with the ownership, at least with the authority to sell the stock under the circumstances disclosed by the record; at all events, he carried on the business in his own name and for his own account. It was not only known but approved by the creditors, who continued to deal with him on terms of credit. It is shown that during the time he thus continued in business, he purchased goods, to keep up his assortment, to the amount of $11,000 and paid for them; that he received consignments of ploughs, carts, wagons, &c., for sale on commission; and that the money arising from this sale of his goods and such consignments was applied indiscriminately to the payment of all his liabilities. It is shown that he has paid on account of the debts due by the firm $16,345 72, exclusive of $1778 65, the amount paid the Mechanics' & Traders' Bank, and the indorsement of *Thibaut* and *Tureaud*, amounting to upwards of $10,000. We think the evidence shows conclusively that he has fairly accounted for his liability to the creditors resulting from the management of the assets of the firm of *Hogan & Tureaud*. But it is said that he has misapplied the notes of *Lock* given as the price of the goods sold. It is in proof that he was largely indebted to *Busby, Little & Co.* for consignments, and gave in part payment thereof six of the *Lock* notes; he also gave two others in payment of the claim of *B. E. Exly*, a wheelwright and wagon-maker, and the remaining two appear to have been transferred to *Julia D. Dean.* Upon the whole, after a careful perusal of all the evidence which is voluminous but not contradictory, we are of opinion it is insufficient to sustain the charge of fraud against *Hogan* under the statute of 1840. *Lock* was clearly not a creditor of the firm of *Hogan & Tureaud* at the date of the sale, as charged in the plaintiffs' petition; he had ceased to be so for more than a year before in relation to the two notes which he had endorsed to the Mechanics' & Traders' Bank; and as to the third, endorsed to *Twibill & Edwards*, which he was compelled to pay since the date of the sale, it appears that the two last instalments thereon are still due him. The allowance of his claim in part payment of the price, as it placed him upon the same footing with the other individual creditors of *Hogan*, should not, in our opinion, affect the validity of the sale.

It is therefore ordered, adjudged and decreed, that the judgment of the court below, so far as it decrees the defendants *Jeremiah S. Hogan, Joseph P. Tureaud* and *Léon Séré* to pay, *in solido*, to the plaintiffs, three hundred and ninety-six dollars and thirty-two cents., with interest on one hundred and ninety-two dollars and eighty cents., from the 4th of March, 1853, at the rate of seven per cent. per annum, and like interest on two hundred and three dollars and forty-three cents., from the 4th of January, 1854, till paid, be affirmed with costs; and that in every other respect said judgment be avoided and reversed, the said plaintiffs to pay the costs of appeal, and so far as relate to said *Samuel Lock* also those of the court below.

WRIGHT          LEA, J., dissenting I think a sale made by an insolvent debtor of his entire
v.
HOGAN.      stock in trade, on terms of credit, to a creditor who is fully aware of his insol-
vency, ought not to be protected, especially where the creditor takes the goods
in part payment of his own claim. I am not satisfied, from the evidence, that
the plaintiffs are estopped by having consented to the sale.