No. 13,402.

E. W. TEDDLIE AND J. E. DUNN vs. J. H. McNEELY, ET ALS. (CONSOLIDATED.)

## SYLLABUS.

Where a party holds lands under a grant confirmed by Act of Congress, followed by surveys locating the lands of the grant in place and by possession extending back more than seventy years, he will be protected from a claim under a certificate from the receiver of the Land Office showing an entry of a date subsequent to the original claim, and the party in possession, under the confirmed grant, may plead prescription.

APPEAL from the Fourth Judicial District, Parish of Grant—Machen, J.

*R. J. Bowman* for Plaintiffs, Appellants.

*William C. Roberts* for Defendants, Appellees.

The opinion of the court was delivered by

BLANCHARD, J. Plaintiffs, claiming to have entered under the Homestead Act at the United States land office, certain lands in Section 16,

Township 6 North, Range 3 West, Parish of Grant, went upon the same with the intention of taking possession thereof.

Whereupon defendants, themselves claiming ownership and possession and alleging disturbance by plaintiffs, brought a possessory action to be maintained and quieted in their possession, and coupled with it a prayer for the writ of injunction to restrain plaintiffs.

Issue having been joined on the question of possession—plaintiffs averring defendants to be squatters and trespassers upon the land which theretofore had been public land—judgment was rendered decreeing defendants possessors of the premises, restoring them to the possession, and perpetuating the injunction restraining plaintiffs from disturbing the same.

The terms "plaintiffs" and "defendants" refer to those occupying that relation in the present suit.

Plaintiffs then resorted to this petitory action to enforce their alleged rights of ownership and possession, and from a judgment rejecting their demands, prosecute this appeal.

The basis of plaintiffs' claim is a receipt issued by the Receiver of Public Moneys at the U. S. Land Office to E. W. Teddlie and one to J. E. Dunn, on March 1, 1898, each showing payment of homestead entry fees and describing the land entered.

It is well settled that a receiver's receipt is a sufficient muniment of title upon which to found a petitory action.

Defendants claim under a title alleged to have had its origin in 1790.

They assert that the land in controversy is part of and embraced within a certain Spanish grant which Don Estivan Miro, Spanish Governor or Captain General of the Province of Louisiana, made to Jacques Pecondom in that year.

The description of this grant was 40 arpents front by 40 arpents deep on each side of the Bayou Toreau.

This Bayou Toreau was a small stream of inconsequential length on the north side of Red river in what afterwards became the parish of Rapides—now embraced within the limits of the parish of Grant.

The land in dispute is located very near the town of Colfax, the county seat of Grant parish, and forms part of that fine body of alluvial lands known prior to the civil war, and since, as the "Calhoun plantations". It has been in cultivation for more than sixty years.

The contention of defendants is that the grant to Pecondom was founded upon an order of survey issued by the Spanish Governor and evidenced by a complete Spanish title, and that under the terms of the

treaty of cession of the Louisiana Territory in 1803 between France and the United States, the land it covered never became part of the public domain of the latter.

The further contention is that if it ever did become part of the public domain of the United States, the grant was, after investigation and report by the land officials of the Government, duly confirmed by Act of Congress.

Defendants set up as a chain of title a sale in 1818 from Pecondom to James Bowie; Bowie to Isaac Thomas; Thomas to Pamplin and Baillio; Pamplin and Baillio to William Smith; thence by descent from Smith, who died in 1840 or 1841, to his grand-daughter, Mary Smith, who became the wife of Meredith Calhoun; thence by descent to her children and heirs, William S. Calhoun and Marie Marguerite Ada Calhoun, who married George W. Lane. W. S. Calhoun's interest in his mother's succession was sold in 1882 at sheriff's sale and acquired by L. McNeely and R. S. Cameron. Then followed a partition between them and Mrs. Lane, by which a portion of the land in controversy was awarded to McNeely and Cameron. From the latter, partly by inheritance and partly by mesne conveyances, it passed to certain of defendants.

Another part of the land in controversy was still held in ownership by Isaac Thomas at his death, and it passed to his sole heir, Mrs. Hubbard Flint, who sold to J. Madison Wells, Wells to Walker and Bogan, and they to Meredith Calhoun. At the succession sale of the latter it passed to Deal about the year 1882, and from him by mesne conveyance to certain of defendants herein.

Alleging that they and those under whom they hold have for more than sixty years held uninterrupted, open, notorious possession as owners, defendants plead the prescriptions of ten and thirty years.

The position of plaintiffs is that the land sued for became part of the public domain of the United States following the acquisition of the Louisiana territory, and that it was never severed from the same until entered as homesteads by them.

They deny that the Pecondom grant was ever located upon the land, or, indeed, upon any land. Their contention is that this grant was "floated"—script having been issued to the heirs of Pecondom in 1894 and 1897 in lieu of land in place.

They further contend that the land being part of a 16th section, it and the whole of the section pertained to the State of Louisiana as "school lands", but that the Government of the United States having

disposed of most of the section at an early day and before the school selections were made, the claim of the State was satisfied by script issued in 1853 to and accepted by the State for the whole section, in lieu of the land in place, and, thus, what was left in 1898 of this particular 16th section the United States Land Department was at liberty to dispose of under the Homestead law, and they and others entered it.

It is well to concede right here that these contentions of plaintiffs are sustained by the land officials of the Government.

This brings us to the consideration of the one and only question which the case presents:—

Was the land claimed by plaintiffs public land when they entered it?

If it were, plaintiffs are entitled to a reversal of the adverse judgment of which they complain.

If it were not, the United States was without title and could convey none.

If it be true that there was a complete Spanish title which prevented the land, of which that in dispute formed a part, from falling into the public domain when the cession came, or if, supposing it did fall within the public domain, the United States has parted with the title she once had, then it would follow that the mistakes of her officers cannot make public property that which belongs to private persons. 11 La. Ann. 563; 17 La. 230; 19 La. 510; 5 R. 466.

If the Spanish grant under which defendants claim was recognized as valid by the U. S. Government, and that was done which located it upon lands in place, and part of such lands is that here sued for, it was not within the power of the General Land Office to declare vacant any portion of the same, and to permit a homestead entry upon it.

Flower vs. Duval, 11 La. Ann. 562; Tate vs. Carney, 24 How. 357.

Complete Spanish or French titles required no act of confirmation by the Government of the United States, for they needed no other protection than that offered by the 3rd article of the treaty of cession.

U. S. vs. Wiggins, 14 Pet. 350; Snyder vs. Sickles, 98 U. S. 204; Lavergne's Heirs vs. Elkins' Heirs, 17 L. 230; 40 La. Ann. 712.

A *"complete"* title, in this sense, was one where the terms of the granting act or concession not only sufficed to convey the land, but which so described it as to identify and locate it, or, following the inchoate grant or concession and before the cession from France, that was done in the way of a survey or act of location which identified and segregated it from the mass of other lands, and thus perfected the title. Menard's Heirs vs. Massey, 8th How. 301.

Incomplete titles required confirmation, and Congress passed the Act of the 2nd of March, 1805, to ascertain and adjust titles and claims to land in the ceded territory. 98 U. S. 204.

This was followed by other Acts of Congress upon the same subject matter—those with which we are presently concerned being the Act approved May 11, 1820, entitled "An Act supplementary to the several Acts for the adjustment of Land Claims in the State of Louisiana", and another approved February 28, 1823, bearing the same title.

*"Incomplete"* titles, in this sense, were those where, while the terms of the granting act or concession sufficed to convey lands, or sufficed to evidence a present intention and purpose to convey lands, yet did not describe the particular land granted so as to identify and locate it, and no survey or act of location had yet (prior to the cession) been made.

In other words, an incomplete title was one where the grant or concession, or order of survey, had been made, but the actual identification or location of the land had not taken place; where something had yet to be done to distinguish and segregate the land intended to be granted from the mass of other lands, and thus perfect the title. 8 How. 301.

The evidence, in our view, does not establish that Jacques Pecondom, at the date of the treaty of cession, held a complete Spanish grant.

But he did hold a grant or concession founded on an order of survey signed and executed in his favor by the Spanish Governor on March 24. 1790, which concession called for forty arpents front of land on each side of the Bayou Toreau, by the depth of forty arpents, equal to 3200 arpents, or 2708 American acres.

This description did not sufficiently identify the land to constitute its definite location and by the terms of the grant a survey to ascertain its boundaries was in contemplation of the parties. The grant was founded on "an order of survey". The locality of the lands—on Bayou Toreau—was fixed, and the quantity granted indicated—40 arpents front by 40 arpents in depth—but whereabouts on Bayou Toreau the exact location was to be was left for determination by the survey to be made.

Proof is lacking that this survey was made prior to the treaty of cession. The probabilities are that it was not so made, for we find that Pecondom, in December, 1818, twenty-eight years after the date of the grant and fifteen years after the cession from France, in a deed dated at Pensacola, sold to James Bowie for the consideration of $100.00 all his "right, title, interest and claim in and to a certain tract of land," without other description than that it lay "on the Bayou Toreau in the

post of Rapides, containing forty arpents in front on each side of said bayou, by the depth of forty arpents back", and the declaration that his title was founded on an order of survey and grant made to him by the Spanish Governor in 1790.  Nothing is said of an actual survey and location having been made, nor of the vendor's possession of any specific land.

Bowie is mentioned in this act of sale, which was under private signature, as being a resident of the parish of Avoyelles, and it appears that the act was recorded in that parish, for the copy thereof offered in evidence came from the records there.

What became of the original is not known.  Presumably it was carried to the parish of Rapides, where the land was situated, and recorded there.

The public records of that parish were destroyed by fire in 1864 when the courthouse was burned.

Pecondom's title, then, must be considered as having been incomplete at the date of the cession of the Louisiana Territory because the land his grant covered had not yet been surveyed and located.  This being so, it required confirmation and location.

Was it confirmed and located?

In 1820 D. J. Sutton was register of the U. S. Land Office for the district north of Red river, Louisiana.

By the 3rd and 5th Section of the Act of Congress approved May 11, 1820, he was directed to make report, on the 1st of January, 1821, to the Secretary of the Treasury, of all the claims filed in his office for confirmation of land title founded upon any Spanish grant, concession or order of survey, together with the substance of the evidence in support thereof and his opinion of such evidence, etc.

At the time mentioned he made his report, and in this report he divided the claims submitted to him into four classes.

"The first class comprehends," he says, "those only in which original Spanish titles have been filed in this office."

Into this class as No. 11 of his report he puts the Jacques Pecondom grant and recommends it for confirmation.

This report and recommendation being concurred in by the Secretary of the Treasury pursuant to the 6th Section of the Act of May 11, 1820, Congress passed the Act approved February 28th, 1823, the 2nd Section of which confirms the Pecondom and other grants recommended for confirmation.  The language of the Act in this respect is that the

grants are "confirmed against any claim on the part of the United States."

So here was formal recognition and confirmation of the grant. Now as to its location.

Bowie having purchased the grant from Pecondom sold it to Isaac Thomas of the parish of Rapides. Owing to the destruction of the records in the parish of Rapides, it was necessary to resort to parol testimony to prove this fact. It is so proven.

But it was not possible to prove the date of the sale. It was, however, sometime prior to 1828, for in that year Thomas took possession of the land covered by the grant.

The testimony discloses that the writing evidencing the original Spanish grant to Pecondom was in the parish of Rapides, for it was filed in evidence in the suit of Gillard and others vs. Glenn, tried in that parish in *1839*.

The witness, J. Madison Wells, who testifies to this, states that the transfer from Bowie to Thomas was written on the back of the original grant. He knew this by reason of the fact of his having been one of the jurors who tried the case of Gillard vs. Glenn, which controversy was over the possession of a part of the land covered by the Pecondom grant.

It so happens that this very case came to this court on appeal and was decided here in 1841 in favor of the defendants, who held under Thomas, the vendee of Bowie. See 1 R. 159.

Thomas having acquired the grant, proceeded to reduce the lands covered by the same to possession. To this end he caused it to be surveyed in 1828 by Deputy U. S. Surveyor Kenneth McCrummen, who seems to have acted under the authority of the Surveyor General of the United States.

This survey of McCrummen has twice been recognized by this court, each time forming the basis of judicial action. The first time was in 1834 in the case of Thomas vs. Baillio, 7 L. 410.

This was the same Thomas who had acquired the Pecondom grant from Bowie, and the land the possession of which was involved in that suit formed part of the grant. Thomas claimed under the grant; Baillio, the defendant, asserted title and possession by purchase from the United States. Judgment was in Thomas' favor and on appeal was affirmed. In the course of the statement of the case there given it was said:—

"McCrummen (parish surveyor), a witness sworn for plaintiff, says he surveyed the land in controversy in 1828 by instructions from the United States government, for the plaintiff, which was included in a tract of forty arpents front on both sides of Bayou Toro. Plaintiff asked witness if he did not survey this land for him as claimant under confirmation of the United States government, to which witness replied in the affirmative. Plaintiff being the claimant of the land under confirmation from government, witness was instructed to require of him the payment of the surveyor's fees, which were paid accordingly." 7 L. 411.

The second time was in 1841, in the case of Gillard vs. Glenn, 1 R. 159. Glenn claimed under Isaac Thomas and the land, as in the other case, was part of the Pecondom grant. Judgment below sustained his defense and was on appeal affirmed. In the course of the opinion it was said:—

"On the part of the defendants, it is established by the evidence of several witnesses, stating what they had seen and by other circumstances which go to fix the period, that Isaac Thomas, claiming to be the owner of forty *arpents* front on each side of Bayou Toreau, by the ordinary depth, about the 8th of September in the year 1828, went to the place with a United States surveyor, acting, as is stated, under the authority of the Surveyor General of the United States, and proceeded to mark the lines, establish the corners and locate the claim." 1 R. 161.

Further along it is said:—

"From the evidence before us we cannot doubt that Thomas made his survey in the month of September, 1828, and at the time put Glenn and Duncan in possession of the place they afterwards occupied." 1 R. 163. The opinion then gives the names of the witnesses by whom these facts were proven. Among them was one "Blundell". It should be Blundon, who was one of the chain-carriers for McCrummen in his survey. McCrummen's map of the survey filed in the instant case shows it. This circumstance, together with the date of September, 1828, shows that the survey to which the court referred was that of McCrummen.

This survey was the definite location of the Pecondom grant and followed its confirmation. It was made by authority of the Government and possession by the grantees of the land, within the boundaries as thus fixed, immediately ensued. This possession has continued ever since, so far as the land in controversy is concerned, in those who claimed under Thomas.

But plaintiffs contest the sufficiency of this survey as definitely locating the grant and segregating its lands from the public domain, because it (the survey) was never approved.

True, the copy of the survey and map, taken from the public land records, filed in the case, does not show approval by the Surveyor General, or by the Commissioner of the General Land Office. It does show that the survey and its map were examined. The word "Examined" is found at the foot of the map. A communication from the General Land Office, filed in evidence, shows that the records of that office do not exhibit the approval of the McCrummen survey.

But there is nothing to show that it was ever disapproved or set aside.

In Cousin vs. Blanc's Executor, 19 How., a case quite similar to this, it was held that when a survey of lands covered by a grant was executed according to the order given for it, the purpose being to locate the grant on lands in place, the United States Government was bound by it until it was set aside at the General Land Office.

The situation was and is this:—the Pecondom grant had been confirmed; Thomas claimed it as vendee of Bowie who was Pecondom's vendee; he demanded its location; a United States surveyor was sent to locate it in place; he did so; Thomas entered into possession; this possession founded on this survey was maintained by judgments of this court in the cases heretofore referred to; and this possession continues in his vendees to this day, more than 70 years after the date of the survey. See Bissell vs. Penrose, 8 How. 610.

But if the point be good that the McCrummen survey required approval and is not shown to have ever been approved, then the difficulty is met and, we think, sufficiently obviated by reference to the survey made by A. G. Phelps, U. S. Deputy Surveyor, in 1848. This was a township survey and resulted in furnishing the U. S. Surveyor General's office with a complete township map or plat of survey, noting and locating the private land claims as well as the public lands.

Among the former was the Pecondom claim.

The map shows its location on the same lines as those run out by McCrummen in 1828.

A photo-lithograph copy of the map was supplied by the General Land Office and filed in evidence.

This map does not merely show the Pecondom grant in dotted lines as claimed by plaintiffs, thereby, as they assert, merely indicating the tracing of the former lines of the McCrummen survey, without intend-

ing to adopt same.  It shows the boundaries of the Pecondom grant in continuous black lines, like those used to indicate the subdivisions of the public lands exhibited by the map.

Under date of April 30, 1849, there appears on this map the follow-ing:—

"The above township map has been examined and compared with the approved field notes thereof now on file in this office, found correct and is hereby approved."

This was signed "P. T. Landry, Sur. Gen. La."

So here was a survey and map locating the Jacques Pecondom grant of lands in place; it was approved by the proper land officer and placed of record among the archives of the General Land Office.

If the former survey of McCrummen did not, unapproved, suffice to define and locate the grant, this later and approved survey must be held to have done so.

This was fifty years before plaintiffs acquired the rights they now assert, and at the time plaintiffs' entries were made the tracts of land covered by the same were represented on an approved township map as not public land.  3 R. 294.

Considering the Act of Congress confirming the Pecondom grant and the two surveys locating it in place, it must be held that the land here involved, embraced within its limits, was segregated from the public lands and ceased to be part of the public domain long before plaintiffs were allowed to enter the same under the homestead act.  Langdeau vs. Hanes, 21 Wall. 530.

Where a party holds lands under a grant confirmed by Act of Congress, he will be protected from a claim under a certificate from the Receiver of the Land Office showing an entry of a date subsequent to the original claim, and the party in possession under the confirmed grant may plead prescription.  5 La. Ann. 647; 40 La. Ann. 712.

Plaintiffs can derive no comfort from the act of the Land Department in issuing to the heirs of Pecondom land script to cover the acreage of that grant, on the theory that there had been no location in place.

This was an error of the officials growing out of their want of knowl-edge of the fact that prior to his death Jacques Pecondom had disposed of his grant to Bowie, and, therefore, no part of it, and no right under it, descended to his heirs.  See Bissell vs. Penrose, 8 How. 338.

With regard to the objections made by plaintiffs to the reception in evidence of the copy from the records of Avoyelles parish of the con-veyance from Pecondom to Bowie, if the original deed itself had been

produced it would have been receivable in evidence. It was an ancient record, more than 30 years old. See Stoddard vs. Chambers, 2 How. 122.

But the original conveyance to Bowie was lost, most likely destroyed by the burning of the courthouse in Rapides parish in 1864. Its loss being shown, secondary evidence of its existence and contents was admissible.

The deed was found recorded in the public records of Avoyelles parish where Bowie had lived. A copy from this record was the best evidence obtainable and was admissible in evidence. Greenleaf on Evi., § 509; 17 L. 220, 222, 228; 7 M. (N. S.) 550; 7 Peters, 99, 77; Kittridge vs. Hebert, 9 La. Ann. 154.

Besides, we do not see that the question here raised is of any great concern to plaintiffs, and this is admitted by their counsel as shown by the following extract from his brief:—

"We are not concerned with the various conveyances through which the defendants pretend to claim title from Jacques Pecondom. The single and only question is, was Pecondom ever owner of the land in the boundaries of the survey of McCrummen, made in 1828—*i. e.*, was that land severed from the public domain by that survey? We may state the case more pointedly: Was the land entered by the plaintiffs public land when they entered it? If it was not, the United States was without title and could convey none."

The fact that the United States land officials sold much of the land, covered by the McCrummen survey, as public land in the years following that survey, is a circumstance entitled to consideration, but can· not be given the effect of determining this controversy against defendants. It may be that parties holding the lands so sold under the Pecondom grant may have deemed it easier and cheaper to buy the Government title than to contest, and did so. None of those lands, nor any of the parties to those sales, are involved in the present suit. What was left of the lands of the Pecondom grant, as located by the surveys of McCrummen and Phelps, did not revert to the United States, if ever once severed from the public domain, by reason of the fact that other lands embraced within the limits of the grant had been treated as public lands.

Whatever rights arose under the grant remained intact to the parties in interest and in possession, to be asserted in defence (as now) should their holdings ever be questioned

Judgment affirmed.

Rehearing refused.