———o———

## No. 5669.

## QUAKER REALTY COMPANY PRAYING FOR CONFIRMATION OF TITLE.

### Syllabus.

When possession of lands has been held continuously by petitioners and their authors under a judicial sale made in a succession by the French authorities in the year 1760 of property previously possessed by the deceased, the legal presumption arises that a valid and complete grant had been made by the proper authorities, although no record of it can be found. Such a title is complete by itself and requires no act of confirmation by the United States. The Court decided that a petition for a concession of land from the Spanish authorities amounts to a mere order of survey, and the grant must be perfected. Property of the city cannot be assessed and sold for taxes, and if it is the sale will be set aside.

W. W. Wall, for Quaker Realty Company.

John F. C. Waldo, for City of New Orleans.

His Honor, CHAS. F. CLAIBORNE, rendered the opinion and decree of the Court, as follows:

— 79 —

Plaintiff filed suit under Act 101 of 1898, page 127, for the confirmation of its tax title to the following squares of ground, viz:

1. Square 495, bounded by Erato, Thalia, White and Dupre Streets.

2. Square 501. bounded by Erato, Thalia, Dupre and Gayoso Streets.

3. Square 502, bounded by Erato, Clio, Dupre and Gayoso Streets.

4. Square 503, bounded by Clio, Calliope, Dupre and Gayoso Streets.

Plaintiff alleges that it purchased said squares from the Aztec Land Company, which had purchased from Wm. J. Howcott, who had purchased from the State Auditor under Acts 80 of 1888 and 126 of 1896; that said squares had been adjudicated to the State by the State Tax Collector for the taxes of 1882, assessed to P. Courey and Louis Fishel, as appears by acts before J. H. Spearing, notary, dated February 4th, 1885, and the titles of Courey and Fishel are traced back to 1852. Plaintiff further alleges "that the City of New Orleans pretends to be the owner of all of said squares;" and it concludes by praying that it may have judgment in its favor confirming and quieting its title to said squares and recognizing it as the sole owner thereof.

The city filed a general denial coupled with the admission that it was the owner of said squares.

The case was tried on December 12th, 1907, in the absence of the City of New Orleans, and on the next day judgment was rendered in favor of plaintiff and signed on December 19th, 1907.

On November 24th, 1909, the City of New Orleans filed a suit to annul said judgment and it alleged:

"That the said property (squares) formed part of a tract of land, being a certain triangular tract of

land having its base on Broad Street and its two sides being the prolongation of Philip and Toledano Streets, until said streets meet in a point, and forming part of a larger tract of land bequeathed to the cities of Baltimore and New Orleans jointly by the late John McDonogh, which said tract contained about 177 2/3 arpents in the rear of the Faubourg Livaudais and being a triangle with its base the line nearly the line of Howard Street formerly St. George Street, and formed between the converging side line of Philip Street and Toledano Street (or the Delachaise line) acquired by said late John McDonogh by purchase from Matthew Morgan, Samuel Peters, Levi Pierce and Wm. H. Chase by act passed before Felix Grima, late notary in this city on February 10th, 1836, Reg. C. O. Bk. 20, p. 17, also Bk. 222, page 527, which said title of the said McDonogh was duly confirmed by Act of Congress adopted June 7th, 1858, and which said title has also been set forth and recognized by judgment of this Honorable Court in the cause entitled 'City of Baltimore v. City of New Orleans,' No. 19,511 of the docket of this Honorable Court, as per judgment therein rendered, and subsequently affirmed by the Honorable the Supreme Court of the State of Louisiana, No. 11,171 of its docket, and reported in 45 La. An., p. 526; that at the time of the suit of the said Quaker Realty Co., Ltd., for confirmation of title, the City of New Orleans was the owner of an undivided one-quarter of said remaining triangular tract beginning with Broad Street; further that the said tract or the share and interest of the City of New Orleans therein was property held by the City of New Orleans in trust for public uses and purposes that the said share and interest of the City of New Orleans was the share and interest of the people of this community, public property, not susceptible of adverse possession or acquisition by prescription, and not subject to levy, assessment and sale for taxes, so that the acquisition thereof by the plaintiff and his vendors through the

tax sales recited in its petition was nugatory, and said tax sales were null and void and of no effect, at least so far as concerns the interest of the public administered by the City of New Orleans."

The City also urges other causes of nullity of the assessment and sale for taxes, which it is not necessary to notice. It is admitted by plaintiff that if the city is the owner of said square that they could not have been assessed under the law. Therefore, if we find that the City is the owner of said squares, the tax sale must be set aside, but if we come to the conclusion that she is not the owner of them, then, she has no right to raise those questions. To this petition of the City of New Orleans the Quaker Realty Company filed exception of no cause of action, which was maintained. But on appeal to this Court the exception was overruled and the case remanded for trial on the merits. **7 Ct. of Ap., 296.**

Thereupon the Quaker Realty Company answered, denying that the City of New Orleans or John McDonogh had any title to said squares. Further answering the company averred:

"That on December 22nd, 1795, the Spanish Governor, Baron de Carondelet, granted to Jean Baptiste McCarty a tract of land situated back of the City of New Orleans, bounded on the North side by the Canal, Carondelet, Bayou St. John and part of Roquigny's land, on the northwest side of the lands of claimant, McCarty, on the southwest by lands of claimant, McCarty, and the lands of Bore and on the southeast by vacant lands, containing about 1300 acres superficial;"

that said grant was complete and perfect in every respect and was confirmed by Act of Congress approved February 28th, 1823, on the application of Barthelemy McCarty and by successive transfers, the company brings the title down to P. Courey.

The company also pleads that the city is estopped from claiming ownership of these squares because she has repeatedly recognized the validity of the title of McCarty under said grant, has purchased some of it, from private individuals, has assessed it and collected taxes therefrom.

We think that the City of New Orleans cannot be estopped by the acts of her officers in those respects.

**Quaker Realty Co. vs. Labasse, 131 La., 996.**

The company also pleads the prescription of ten and thirty years. We have already seen that these squares were unoccupied and therefore cannot be acquired by prescription.

This is not a petitory action, nor an action in jactitation, as the squares claimed are in the swamps, not improved or fenced in, and with nothing to indicate that they had ever been possessed by anybody. Tr., p. 18. It is rather "an action to establish title" under Act 38 of 1908, p. 38, in which "the Judge shall decide which of the claimants are the owners of the land in dispute" on the strength of their respective titles.

The City of New Orleans supported her pretensions by offering in evidence the following titles, viz:

Copy of an adjudication or sale dated April 17th, 1760, made by virtue of an order of the Supreme Council of the Province of Louisiana, by C. M. D. Dapremont counsellor assessor of said council, appointed commissioner for that purpose, accompanied by J. B. Ragnet, counsellor of said Council, acting as Attorney General of the King to De Pontalba, of the following property, viz:

"A plantation belonging to the Succession of the deceased Mr. and Mrs. Broutin, situated at about one league above and on the same side of this city going up the river, adjoining on one side the plantation of the Succession of Mr. Delino, deceased, and

— 83 —

.on the other that of Mr. Caminada, having about eleven and a half arpents front by the whole depth which might be found, and following the point it runs to the said land closing to a point in its said depth together with all the buildings thereon without any reservation nor exception, and moreover the quantity of ten and one-half arpents of ground front from the limits of the forty arpents depth of the land of the deceased Mr. Delino by the whole depth which might be found, and following the point of the compass to which it runs; this portion of ground also belonging to the succession of the said Broutin, deceased, who reserved the same for himself at the time that he sold to the late Mr. Delino the ten and a half arpents from the front part by forty arpents depth only between parallel lines (on April 22, 1751)."

This plantation as above described measured 127 and one-third arpents deep from the Mississippi River to the point where the lateral lines met and closed. It is admitted that the squares in dispute are within the 80 arpents line which begins near Hagan Avenue.

Then follows the sale of the same plantation in August 1760 to Dargenton with the same description.

In the next sale to Jacquelain the Plantation is described as having 80 arpents deep.

The same depth is given in the sale to Le Marques on October 29, 1767.

The next sale of September 9th, 1768, to Chatalan, also gives the plantation 80 arpents deep.

At this point there is a break in the chain, but it is admitted that an original act of sale by Chantalon to Santiago Livaudais before Garic on March 3rd, 1769 is not among his archives.

In the marriage contract between S. F. E. Livaudais, son of S. E. Livaudais, and M. Celeste Marigny, dated November 20th, 1797, the future spouse brings in mar-

riage a tract of land containing ten arpents in front upon eighty in depth.

By an act dated December 23rd, 1803, J. F. E. Livaudais sells to J. Francois E. Livaudais two arpents front by 80 arpents deep; bounded on one side by the vendor and the other side by the purchaser being the same which he acquired from Chatalan on March 3rd, 1769, for the price of $2000, which the purchaser has paid in the year 1797 ''since which time he is in possession of said 2 arpents of land, boundaries to which were put at the said time by the Surveyor General of this Province, Don Charles Trudeau de Laveau.''

By act dated June 11th, 1817, the Succession of Jacques Enoul Livaudais sold to Dugue Brothers three arpents and more by eighty arpents deep, bounded on both sides by property of vendor.

By act dated July 6th, 1818, Dugue Brothers sold the same with same front and depth to J. F. E. Livaudais.

By act of Marc Lafitte, dated January 25th, 1826, J. F. E. Livaudais sold to his wife, Marie Celeste Marigny,

''A plantation measuring sixteen arpents 13 toises and more, if any, front, of which nine arpents above have a depth of 80 arpents, and the balance has a depth of 40 arpents.''

The seller also sells all the rights which may have been recognized as belonging thereto according to said seller's titles in the depth of the plantation presently sold, and beyond the depths already established, without any guarantee on his part for these same eventual rights, which he declares to have never alienated. The whole according to a plan of said plantation by Bringier, Surveyor General, dated January 7th, 1826, and a sketch of Joseph Pilie, Surveyor for the City of New Orleans, dated December 13th, 1825, annexed to said act.

By act dated February 24th, 1832, Mistress Marie Celeste Marigny Livaudais sold to M. Morgan and others the same plantation measuring 16 arpents, 20 toises front "with all the depth thereto belonging." She gives a warranty for 13 arpents 8 toises front by 40 arpents deep, and transfers also the rights she might have to the double concession, that is to 80 arpents deep; and she sells the balance of the property with the rights to the double concession and to all the rights accruing from her titles, but without any warranty.

By act dated February 10th, 1836, M. Morgan and other sold to John McDonogh all the lands in the rear of the 40 arpents line with warranty to a part and without warranty to the remainder, covering the four squares herein claimed.

It will be noticed that from 1760 to 1818 all the sales are made for 80 arpents deep with full warranty, and that it is only in 1826 that Livaudais, selling to his wife, restricts the depth and the warranty.

It was admitted that John McDonogh died in 1850, that he left a will constituting the Cities of New Orleans and Baltimore his universal legatees; that his will was duly probated as appears in the 8 A. P., 174; and that said cities were recognized and put in possession of the property left by John McDonogh for public school purposes.

The City of New Orleans also offered as evidence the report of B. Z. Canange, Register, and Richard M. Carter, Receiver, United States Land Office for the Eastern District of Louisiana, dated November 11th, 1837, on claim No. 39 of John McDonogh. In speaking of the sale or adjudication of the Supreme Council of the Province of Louisiana to Pontalba on April 17th, 1760, these officers say:

"This document is the most perfect Government title that could be issued; it is fully equivalent to a

patent (and it is indeed in itself a patent) as the Supreme Council of the Province was at the head of the land office, granted the lands and issued the patents."

In the suit of **John McDonogh vs. The United States,** No. 42, United States District Court for the Eastern District of Louisiana, in which the plaintiff claimed part of the lands acquired by Pontalba in April, 1760, that Court added to the report of the Register and Receiver:

"These repeated sales by the officers of the Government clearly and fully recognize that the land was held by a legal and valid title from the Government, and thus it must be considered that a grant had issued for it previously to the year 1760 in favor of Broutin."

And judgment was rendered in favor of McDonogh in June, 1849. From this judgment an appeal was taken to the Supreme Court of the United States, which is reported in **15 Howard, 36.** That Court said:

"Now the title set up by the petitioner is a complete legal title; and if he can establish the facts stated in his petition his title is protected by the treaty itself, and does not need the aid of an act of Congress to perfect or complete it. For undoubtedly, if the possession of the land has been held continually by the petitioner and those under whom he claims under the judicial sale made by the French authorities in 1760 the legal presumption would be that a valid and perfect grant has been made by the proper authority, although no record of it can now be found."

By an Act of Congress of June 7th, 1858, the claim of John McDonogh was approved.

The claim of J. F. E. Livaudais for 19 3/4 arpents front by 80 arpents deep was also recognized by the Reg-

ister of the land office for the Eastern District of Louisiana in January, 1821, and confirmed by Act of Congress in 1823 and recognized in American State Papers, Vol. 3, p. 584.

The claims of the Quaker Company are grounded on the following documents. In December, 1795, I. B. McCarty addressed a petition to Baron de Carondelet in which he alleged:

> "That having to make the survey and demarcation of his lands coming from Don Louis Ceasar Le Breton, an old resident of this Colony, according to the titles of the concession which had been accorded to him, it turns out that the portion which that proprietor sold with front on the Bayou Road with a depth of ten arpents or thereabout upon parallel lines directed in the tract of the West has been resold by one of those who acquired it in different portions to various individuals with directions in their depth to the south 57 degrees and a half west, which makes a difference towards the city of an angle of 32 degrees and 30 minutes; and since following the first direction to the west corrected it should necessitate the disquieting of the actual possessors who have established themselves in the ignorance of this circumstance and in the confidence of setting up peaceable possession, believing their boundaries invariable; Supplicates Your Excellency may be pleased to concede to him the continuation of this line which runs to the south 57 degrees 30 minutes, from the ten arpents sold with this direction until the intersecting with the line of the limit prolonged from the bank of the Mississippi to two leagues more or less up to the Bayou St. John cutting that of Don Bertrand Gravier at its extremity without prejudice to him, in order to avoid every disturbance of the peaceable possession and in order to bound his lands with the lands of the common of this city, the petitioners propose under these conditions to make the entire abandonment of

the lands which there are on the east of the new canal of this city from the line of the boundary between Griffon and Su Moro up to the bridge of the Bayou St. John, in favor of the common of the city or whomsoever Your Excellency may please, taking the said canal as a common dividing boundary between the aforesaid lands and those of the petitioner, & etc.''

At the bottom of this petition are the words:

''New Orleans, 22nd December, 1795. Granted, provided that within the term of six months no legitimate opposition is presented thereto.

"Signed. The Baron de Carondelet.''

From Volume 3, p. 587, of the American State Papers it appears that the commissioner reported that the claim should be confirmed.

After reciting that a former board had rejected the claim on the ground that it was apparent that said lands were covered with other grants long anteceedent to the one set up by McCarty, but that it now appeared on the testimony of Lafon and Pilie, that the land does not interfere with any other grant, he concludes:

''But, admitting the fact, I conceive the only point then as well as now to be decided, is whether the United States have any claim to said land. I am of the opinion that they have not, and, therefore, think that this claim should be confirmed.''

The claim was confirmed by Act of Congress of February 28th, 1823, and by Act of July 6th, 1842, Vol. 5, p. 491.

In the presence of the many official and judicial recognitions of the validity of the title of April 17th, 1760, to Pontalba, we are bound to come to the conclusion that his title was good and that he transmitted a valid title to his successors.

Even if we were to admit that McCarty ever acquired a title to these lands, we are bound to decide that the title to Pontalba was better on account of its priority. But McCarty's pretensions to a title could never stand the test of judicial investigation.

In the early case of **Fleitas v. Mayor, 1 N. S., 430 (1824)** the Supreme Court of this State in passing upon the title claimed by McCarty said it amounted only to an order of survey. that in order to be perfect it lacked the complete title which should have followed the return on the order of survey. **104 La., 606; 8 How., 293; 4 A., 99.**

A complete title or concession, says H. B. Cenas, Registrar of the United States Land Office, is one that issues after the survey has been made and returned.

Pontalba's superior claims to McCarty's were again adjudicated upon in **Moore v. Pontalba, 13 La., 571.**

In the case of **Pontalba v. Copland, 3 A., 86,** the decision of Fleitas was affirmed. There is no evidence anywhere that McCarty actually abandoned or that the government ever took possession of those lands which McCarty, under the offer of concession to him was to surrender on the "east" of the new canal of this city.

The McCartys, themselves, were unable to define the extent of their possessions. In the sale of Edmond McCarty to B. McCarty by act Pedesclaux, April 14th, 1809, the plantation is described as measuring 26 arpents front "without its being possible to stipulate its true depth."

The same description is given in another sale by B. McCarty to his sister by act dated March 7th, 1826.

By an act of sale by B. McCarty to Kohn & Marigny, the plantation is sold by name only without any measurements in front, sides or rear.

The same uncertainty exists in the sale by Mrs. McCarty Lanurse to Canal Bank on December 19th, 1832.

, McCarty seems to have taken advantage of this uncertainty to harass his neighbors and provoke suits against himself. For we find Don Andres Almonaster filing suit against him for trespass and for having appropriated a lot of axes, and the papers in the case served upon McCarty, a prisoner in Fort St. Charles.

It is true that Pilie and other serveyors establish the McCarty line on Broad Street. But other surveyors differ with them. Besides Broad Street is on the 60 arpent line from the river. No one ever contested the rights of the city to the lands lying between the 40 arpents line (St. George or Howard Street) and the 60 arpents line, Broad Street. Yet its title to that portion of ground is identically the same as its title to the lands between the 60 arpents line and the 80 arpents line, or between Broad Street and Hagan Street. But the opinion of Pilie and other distinguished surveyors cannot prevail over the decisions of our Supreme Courts rendered after hearing all parties. Besides, it is proven that McCarty's pretention, if admitted, would encroach upon the rear portion of many concessions.

For these reasons we think the judgment of the lower Court is correct and it is affirmed, in so far as the interest of the City of New Orleans is concerned.

## On Application for Rehearing.

Per Curiam: The plaintiff submits ten grounds of error in our judgment herein.

The sixth ground is that this Court erred in holding:

"An adjudication of the property at a succession or probate sale, made by virtue of an order of the Supreme Council of the Province of Louisiana, acting as a Probate Court, was equivalent to a grant of the land by the French Government in its political capacity. This conclusion by your Honors is in direct

conflict with the decision rendered by the Supreme Court of the United States in the case of the **United States v. Ducros, 15 Howard, p. 40.**''

In the above case the Court said:

''A grant by the French authorities after the cession of Louisiana by France to Spain in 1762 is void.''

The French grant in that case was dated in 1764; the adjudication in the present case was dated in 1760. Therefore, the Ducros case has no application to the present case. The remaining reasoning of the Court cannot be construed as tacitly overruling what was so clearly said by the same Court in the preceding case of the **U. S. Roselius** on pages 36 and 38 of the same volume quoted in our opinion.

We have examined the other nine grounds of error and they have not satisfied us that we were in error.

Our original decree is amended to conform to the plaintiff's petition so as to read as follows:

''The judgment of the lower Court being construed as annulling the judgment of confirmation in so far only as the interests of the City of New Orleans are concerned is affirmed.''

In other respects the rehearing is refused.

Opinion and decree February 9th, 1914.

Rehearing refused March 9th, 1914.

Writ denied April 13th, 1914.

Note by reporter:—(The original of the foregoing opinion is not in the 'Clerk's office. The above opinion is a verbatim copy of the opinion which the Clerk of Court sent to the lower Court, as a true copy of the original opinion.)